**No. 26-02052**

***In the***

# United States Court of Appeals

***for the***

# First Circuit

FRESENIUS USA MANUFACTURING, INC.,
*Plaintiff-Appellee,*

– v. –

MICAH MUCH,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:26-cv-13572, Hon. Denise J. Casper

## OPENING BRIEF FOR APPELLANT

STEVEN J. TORRES [#1162938]
JONATHAN M. SHINE [#1135879]
*Torres Scammon Hincks & Day*
*119 High Street*
*Boston, MA 02110*
*(617) 206-4895*
*storres@tshdlegal.com*
*jshine@tshdlegal.com*

RACHEL COWEN [#1198975]
*Dechert LLP*
*444 W. Lake Street, Suite 2100*
*Chicago, IL 60606*
*(312) 646-5825*
*Rachel.Cowen@dechert.com*

*Counsel for Defendant-Appellant Micah Much*

# TABLE OF CONTENTS

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

QUESTIONS PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

I. Much Worked Only for Fresenius Manufacturing, Within the Broader FME Conglomerate .......... 5

II. Much has Extensive Employment History In Supply Chain .......... 7

III. "Supply Chain" Can Include Procurement, Manufacturing, and Demand Planning and Logistics .......... 8

IV. Much's Role at Fresenius Manufacturing Was Limited to Demand Planning and Logistics .......... 10

V. The Alleged Trade Secret Information is Not Confidential Or Useful to Vantive .......... 13

VI. Fresenius Manufacturing Offers Much a Promotion and Then Retracts It 20

VII. Much Accepted a Position at Vantive Only After Fresenius Manufacturing Reneged on Its Offer to Promote Him .......... 22

VIII. Much Takes On a Substantially Different Role at Vantive .......... 22

PROCEDURAL HISTORY .......... 25

SUMMARY OF THE ARGUMENT .......... 26

STANDARD OF REVIEW .......... 28

ARGUMENT .......... 29

I. The District Court Erred When It Construed the MNAA To Allow Appellee to Extend Protection to 1,450 Entities Beyond Much's Employer .......... 29

II. The District Court Erred When It Construed The MNAA To Enforce A Restrictive Covenant Without Proof That It was "*Necessary*" .......... 37

III. The District Court Improperly Resolved Material Factual Disputes Without an Evidentiary Hearing .......... 42

IV. The Order of Injunction Violates Rule 65(d) by Lacking the Requisite Specificity, Referring to Other Documents, and Restraining Conduct Untethered to Record Evidence .......... 48

CONCLUSION .......... 53

# TABLE OF AUTHORITIES

## CASES

*Anaplan Parent, LP v. Brennan*, No. 2584CV02350 (Mass. Super. Ct. Sept. 15, 2025) ....................29, 33, 34

*Aoude v. Mobil Oil Corp.*, 862 F.2d 890 (1st Cir. 1988)....................28

*Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC*, 793 F.3d 313 (3d Cir. 2015) ....................43

*Campbell Soup Co. v. Giles*, 47 F.3d 467 (1st Cir. 1995) ....................42

*Club Aluminum Co. v. Young*, 263 Mass. 223, 160 N.E. 804 (1928)....................38 n6

*Danieli & O'Keefe Assocs. v. Braverman*, 1994 WL 879855 (Mass. Super. Ct. Jan. 20, 1994) ....................38

*Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125 (2002)....................36

*Díaz-Báez v. Alicea-Vasallo*, 22 F.4th 11 (1st Cir. 2021)....................33

*DraftKings Inc. v. Hermalyn*, 118 F.4th 416 (1st Cir. 2024)....................35, 36, 38

*Ethicon, Inc. v. Angelini*, 687 F. App'x 859 (11th Cir. 2017) ....................43

*Fleming Sales Co. v. Bailey*, 611 F. Supp. 507 (N.D. Ill. 1985) ....................39

*Fortiline, Inc. v. McCall*, 2024 WL 4088629 (Del. Ch. Sept. 5, 2024) ....................36

*GlobalTranz Enters. Inc. v. Murphy*, 2021 WL 1163086 (D. Ariz. Mar. 26, 2021) 40

*Hyannis Port Rsch., Inc. v. Gonzales*, 2022 WL 17999498 (Mass. Super. Ct. Dec. 23, 2022) ....................2, 39

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64 (1967)....................51

*ISO Claims Partners, Inc. v. Cassavoy*, 2017 WL 2233502 (Mass. Super. Ct. Mar. 20, 2017) ....................38 n6

*Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507 (Del. Ch. Oct. 6, 2022) ....................36

*Langlois v. Abington Housing Auth.*, 207 F.3d 43 (1st Cir. 2000)....................28

*Laughlin v. Fresenius Med. Care Holdings, Inc.*, No. 2:23-cv-00180 (E.D. Wash. Aug. 24, 2023) .......... 32

*Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364 (3rd Cir. 2021) .......... 50, 51

*Mundell v. Acadia Hospital Corp.*, 92 F.4th 1 (1st Cir. 2024) .......... 41

*NuVasive, Inc. v. Day*, 2019 WL 2287709 (D. Mass. May 29, 2019) .......... 40

*Ortman v. Bio-Med. Applications of Pa., Inc.*, No. 1:24-cv-11599 (D. Mass. Aug. 15, 2024) .......... 33

*Otis Elevator Co. v. Int'l Union of Elevator Constructors*, 408 F.3d 1 (1st Cir. 2005) .......... 28

*Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412 (7th Cir. 2008) .......... 52, 53

*Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003) .......... 42, 43

*Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1 (1st Cir. 2009) .......... 28, 29, 48

*SH Franchising, LLC v. Newlands Homecare, LLC*, 2019 WL 356658 (D. Md. Jan. 29, 2019) .......... 39, 40

*Union Home Mortgage Corp. v. Cromer*, 31 F.4th 356 (6th Cir. 2022) .......... 48, 49, 50

## STATUTES

18 U.S.C. § 1836 .......... 4

28 U.S.C. § 1331 .......... 3

28 U.S.C. § 1332(a) .......... 3

28 U.S.C. § 1292(a)(1) .......... 4

Mass. Gen. Laws ch. 149, § 24L(b) .......... 2, 4, 30, 37

Mass. Gen. Laws ch. 149, § 24L(b)(iii) .......... 2, 29, 38, 41

Mass. Gen. Laws ch. 149, § 24L(b)(vi) .......... 37, 41

Mass. Gen. Laws ch. 149, § 24L(f) .......... 34

## RULES

Fed. R. App. P. 4 .......... 4

Fed. R. Civ. P. 7.1(a) .......... 31

Fed. R. Civ. P. 65 .......... 2, 5

Fed. R. Civ. P. 65(d) .......... 27, 48

Fed. R. Civ. P. 65(d)(1) .......... 28, 29

Fed. R. Civ. P. 65(d)(1)(C) .......... 48

## OTHER AUTHORITIES

Jerry Cohen et al., *Employee Noncompetition Laws and Practices: A Massachusetts Paradigm Shift Goes National*, 103 Mass. L. Rev. 31 (2022) .......... 36

Exchange Act Rule 12b-2 .......... 30 n2

Justice Antonin Scalia & Bryan A. Garner, *A Dozen Canons of Statutory and Constitutional Text Construction*, 99 Judicature 2 (2015) .......... 41

Securities Act Rule 405 .......... 30 n2

## INTRODUCTION

Appellant Micah Much ("Much") is a 30-year supply chain veteran who has been barred from working in the field in which he has spent his career. This appeal challenges the preliminary injunction precluding Much from serving as Executive Vice President and Chief Supply Chain Officer of Vantive US Healthcare, LLC ("Vantive") until July 24, 2027.

Much worked for Fresenius USA Manufacturing, Inc. ("Fresenius Manufacturing") for four years in a regional demand planning and logistics role. Much never had responsibility for procurement (purchasing raw materials) or manufacturing (overseeing factory operations)—the core of Much's position with Vantive. During his employment with Fresenius Manufacturing, Much executed a noncompetition agreement that prohibits him from working for a competitor for one year in a role where his responsibilities are the "same as" or "substantially similar to" any of the duties and responsibilities he performed for his employer and 1,450 "related/affiliated" entities operating worldwide.

On July 16, 2026, Much resigned his employment with Fresenius Manufacturing to accept a substantially different and larger role with Vantive. Fresenius Manufacturing filed suit and asked the district court to enjoin Much from working for Vantive in any capacity, anywhere in the world. (*See* Joint Appendix ("J.A.") Vol. I 96-97). On September 10, 2026, the district court granted Fresenius

Manufacturing's request for a preliminary injunction and entered an Order of Injunction. (Addendum (LR 28) ("Add.") 20).

That injunction is erroneous and should be reversed for four separate reasons:

1. The district court erred when it held that the MNAA—which provides that a noncompete provision be "no broader than necessary to protect. . . the employer's trade secrets . . . confidential information . . . [or] goodwill." G.L. c. 149 § 24L(b)—allows Fresenius Manufacturing to enforce a noncompete extending such protection to 1,450 additional entities.

2. The district court erred when it excused Fresenius Manufacturing from establishing that Much's noncompete provision was "necessary" to protect Fresenius Manufacturing's confidential information, trade secrets, and good will as required by the MNAA. Instead, the district court enjoined Much merely because he had *access* to Fresenius Manufacturing's confidential information, which Vantive *could* use for its benefit, rather than meeting the requisite showing that the confidentiality and non-solicitation provisions in the same agreement would be insufficient. *Hyannis Port Rsch., Inc. v. Gonzales*, 2022 WL 17999498, at *4 (Mass. Super. Ct. Dec. 23, 2022); G.L. c. 149 § 24L(b)(iii) ("A noncompetition agreement may be presumed necessary where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant, including but not limited to a . . . confidentiality agreement.").

3. The district court erred when it found facts and weighed evidence to resolve factual disputes in Fresenius Manufacturing's favor without an evidentiary hearing. Here, there were disputed issues of material fact both as to whether Much was in breach of his covenant and whether Fresenius Manufacturing would suffer irreparable harm.

4. The district court erred in issuing an Order of Injunction that fails to meet the specificity requirements of Fed. R. Civ. P. 65 and instead merely states that Much is barred from serving at Vantive under a particular job title, without any specificity about what duties he may or may not perform. And, when Much asked the district court to clarify its order so that Vantive could determine if it can employ Much in an alternative role (J.A. Vol. II 584-85), the district court declined to clarify its decision (J.A. Vol. II 647). The injunction order impermissibly leaves Much and Vantive uncertain as to whether employing him exclusively to perform manufacturing and procurement would leave him in contempt.

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity between Fresenius Manufacturing, a Delaware corporation with its principal place of business in Massachusetts, and Much, a Texas citizen. The district court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because

Fresenius Manufacturing brings a claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

On August 31, 2026, the district court entered a Memorandum and Order granting Fresenius Manufacturing's request for a preliminary injunction, followed by an Order of Injunction on September 10, 2026 (Add. 2, 20). This Court has appellate jurisdiction over the Order of Injunction pursuant to 28 U.S.C. § 1292(a)(1). Much timely filed an interlocutory appeal of the Order of Injunction on September 11, 2026, well within the requisite 30 days under Fed. R. App. P. 4.

## QUESTIONS PRESENTED

1. Did the district court err when it held that the MNAA—which provides that a noncompete provision be "no broader than necessary to protect. . . the employer's trade secrets . . . confidential information . . . [or] goodwill" G.L. c. 149 § 24L(b)—may extend such protection to Fresenius Manufacturing's 1,450-plus different affiliated or related legal entities.

2. Did the district court err when it concluded that Fresenius Manufacturing established that Much's noncompete provision was "necessary" to protect Fresenius Manufacturing's confidential information, trade secrets, or good will under the MNAA, without evaluating whether the confidentiality and non-solicitation provisions in the same agreement would be sufficient.

3. Did the district court impermissibly weigh evidence and resolve factual

disputes in Fresenius Manufacturing's favor and, without an evidentiary hearing in connection with its holdings, that Much was in breach of his covenant and that Fresenius Manufacturing would suffer irreparable harm.

4. Does the district court's Order of Injunction fail to meet the specificity requirements of Fed. R. Civ. P. 65 by stating merely that Much is barred from serving at Vantive under a particular job title, without specifying precisely what duties he may or may not perform.

## STATEMENT OF THE CASE

### I. Much Worked Only for Fresenius Manufacturing, Within the Broader FME Conglomerate

Fresenius Manufacturing is an indirect subsidiary of Fresenius Medical Care Holdings, Inc. ("Holdings"), which is in turn a subsidiary of its parent, Fresenius Medical Care AG ("Medical AG"). (J.A. Vol. I 94). Together, Medical AG and its subsidiaries collectively operate as Fresenius Medical Care ("FME"), a global conglomerate controlling approximately 1,450 legal entities providing renal-care products and services. (J.A. Vol. II 473-539 (McConnell Decl. Ex A)).

FME organizes its entities into three business divisions: Care Delivery, Value Based Care, and Care Enablement. (J.A. Vol. II 423 (Much Decl. ¶ 17)). The Care Delivery division operates over 2,600 outpatient dialysis centers around the world. (J.A. Vol. II 423 (Much Decl. ¶ 18). The Value Based Care division is run through Interwell Health and employs 1,400 nephrologists to advance renal care initiatives

around the world. (J.A. Vol. II 423-24 (Much Decl. ¶ 19).

The Care Enablement division, where Much worked, manufactures and distributes dialysis products, including equipment and disposable supplies used for dialysis. Much had no responsibility for FME's Care Delivery or Value Based Care divisions. (J.A. Vol. II 418, 423-4 (Much Decl. ¶¶ 3, 17-20)).

Much worked for only Fresenius Manufacturing (which is part of FME's Care Enablement division). (J.A. Vol. II 423-25 (Much Decl. ¶¶ 16, 24)). Fresenius Manufacturing makes and delivers dialysis products to FME's dialysis centers, to dialysis centers operated by competitors such as DaVita, and to peritoneal dialysis ("PD") patients receiving dialysis in their homes. (J.A. Vol. II 424 (Much Decl., ¶ 20)). Originally hired as Vice President of Supply Chain, North America, Much's title changed to Vice President of Supply Chain for the Americas in January 2025. (J.A. Vol. II 417 (Much Decl. ¶ 1)).

In connection with FME's long-term incentive plan, Much executed four substantially identical Protective Covenants Agreements ("PCA"), dated November 28, 2022; August 1, 2023; July 25, 2024; and July 28, 2025. (J.A. Vol. I 20-1, ¶ 28).[1] In pertinent part:

- Much "acknowledge[d] and agree[d] that in connection with [his] employment, [he had] and will be given access to Confidential

[1] The provisions at issue in this case are substantially identical across the four agreements. For brevity, Much references only the most recent.

Information and Trade Secrets (as defined herein) that have been acquired or developed by the Employer and its related/affiliated companies (collectively referred to as the "Company"). (J.A. Vol. I 75, § 1).

- Much agreed that a "'Competing Business' means any person, entity, or organization (other than the Company) that is engaged in or planning to engage in the production, distribution, marketing, providing, or selling of products, processes, or services that are competitive with any business that the Company conducts or proposes to conduct at any time during [his] employment." (J.A. Vol. I 79, § 5(a)(i)).

- Much agreed to a "Restriction Against Unfair Competition," pursuant to which "during [his] employment and for a period of twelve (12) months following termination . . . [he] will not, directly or indirectly . . . work for or in furtherance of any Competing Business within the Restricted Area in circumstances where [his] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities [he] performed for the Company during the lookback period." (J.A. Vol. I 81-2, § 5(b)). Thus, the PCAs define "Company" to include Much's employer and all related or affiliated entities, and they bar competition with any business the "Company" conducts. More than 1,450 entities—none of which employed Much—therefore receive the benefit of a restriction the MNAA reserves for "the employer."

## II. Much has Extensive Employment History In Supply Chain

Much has worked in supply chain for more than 30 years, beginning in the aerospace and defense industry. (J.A. Vol. II 417-18 (Much Decl. ¶ 2)). From 2008 to 2022, Much held increasingly senior positions at Raytheon and ultimately became Executive Director of Supply Chain and Operations for Raytheon's Mission Systems business unit. (J.A. Vol. II 417-18 (Much Decl. ¶ 2)). In that role, he was responsible for supply chain and operations across a large, international business and for

approximately $2 billion in procurement spending. (J.A. Vol. II 417-18 (Much Decl. ¶ 2)).

Throughout his career, Much has been hired to solve operational problems, improve efficiency, reduce costs, and optimize supply chain networks. (J.A. Vol. II 418 (Much Decl. ¶ 4)). The systems and methodologies that Much developed in aerospace and defense are industry-agnostic. (J.A. Vol. II 418 (Much Decl. ¶ 3)). Fresenius Manufacturing hired Much to apply that transferable expertise to its supply-chain challenges. (J.A. Vol. II 418 (Much Decl. ¶ 3)).

## III. "Supply Chain" Can Include Procurement, Manufacturing, and Demand Planning and Logistics

The term "supply chain" can mean different things at different companies. A supply chain may encompass: (1) procuring materials needed to make goods; (2) manufacturing those goods; and (3) demand planning and logistics, which entails moving goods from the manufacturing facility to the customer, including inventory management (*e.g.*, managing warehouses and inventory storage) and transportation. (J.A. Vol. II 418-19 (Much Decl. ¶ 5)). In some organizations, procurement, manufacturing, and demand planning and logistics report to a single executive, in others, these functions are divided among multiple departments and leaders with different responsibilities. (J.A. Vol. II 418-19 (Much Decl. ¶ 5)). But each serves distinct functions. At Fresenius Manufacturing, those functions were divided with **Much responsible only for demand planning and logistics**. (J.A. Vol. II 418-19,

430-31 (Much Decl.¶¶ 5, 36, 38-39)).

***Procurement*** is a separate process by which a company identifies, evaluates, negotiates, and purchases the goods and services needed to operate its business. (J.A. Vol. II 419 (Much Decl. ¶ 6)). It is often divided into two disciplines: (1) direct procurement; and (2) indirect procurement. ((J.A. Vol. II 419 (Much Decl. ¶ 6)). Direct procurement concerns the sourcing of raw materials needed to manufacture the products sold by a company. (J.A. Vol. II 419 (Much Decl. ¶ 6)). Indirect procurement concerns the acquisition of goods and services that support a company's operations but do not become part of the finished product. (J.A. Vol. II 419 (Much Decl. ¶ 6)). Examples include information technology ("IT") services, legal services, accounting services, office equipment, and similar operational support functions. (J.A. Vol. II 419 (Much Decl. ¶ 6)).

***Manufacturing*** is another separate discipline focused on how products are produced. (J.A. Vol. II 419 (Much Decl. ¶ 7)). Manufacturing specialists oversee, optimize, and troubleshoot daily production processes within a factory and coordinate the flow of raw materials to ensure goods are built efficiently, on time, and within budget. (J.A. Vol. II 419 (Much Decl. ¶ 7)).

***Demand planning and logistics*** can be broken down into further components. *Demand planning* is the process of forecasting future product demand using historical sales data, customer ordering patterns, and market trends to estimate how

much product will be purchased in a particular period. (J.A. Vol. II 420 (Much Decl. ¶ 10)). Once product demand has been forecasted, companies typically utilize a process known as SIOP, or "sales, inventory, and operations planning," to ensure they manufacture and/or deliver enough product to meet demand. (J.A. Vol. II 420-21 (Much Decl. ¶ 11)). SIOP is a cross-functional process, bringing together personnel from commercial, finance, procurement, manufacturing, and logistics functions to ensure that product demand can be met efficiently while minimizing shortages, excess inventory, and unnecessary operational costs. (J.A. Vol. II 420-21 (Much Decl. ¶ 11)).

*Logistics* focuses on the efficient flow of goods and services from the manufacturing facilities to their final destination. (J.A. Vol. II 421-22 (Much Decl. ¶ 14)). Companies may perform these logistics functions using their own assets and personnel, or outsource those functions to specialized third-party logistics providers ("3PLs"). (J.A. Vol. II 421-22 (Much Decl. ¶ 14)).

## IV. Much's Role at Fresenius Manufacturing Was Limited to Demand Planning and Logistics

At Fresenius Manufacturing, Much had responsibility only for demand planning and logistics in certain geographic regions. (J.A. Vol. II 425 (Much Decl. ¶ 26)). Initially, his scope was limited to North America, but in 2025, he assumed responsibility for logistics (but *not* demand planning) for the entire Americas region. (J.A. Vol. II 417, 425-30 (Much Decl. ¶¶ 1, 26-37); Supplemental Appendix ("S.A.")

65-66 (Much Decl. ¶¶ 1, 26-37).

Much's role never included any responsibility whatsoever for manufacturing or procurement. (J.A. Vol. II 430-31 (Much Decl. ¶¶ 38-39)). Much reported to Brett Beck ("Beck"), Global Senior Vice President of Supply Chain, and operated four organizational layers below the CEO. (J.A. Vol. II 424-25 (Much Decl. ¶ 24)). Manufacturing and procurement were managed by others within FME.

With regard to demand planning, each month, Fresenius Manufacturing's commercial team sent Much's team an aggregate forecast for anticipated demand in the United States and Canada. (J.A. Vol. II 429-30 (Much Decl. ¶ 35)). These forecasts were not customer specific but rather combined hundreds of customers that might purchase a particular Stock Keeping Unit ("SKU"). (J.A. Vol. II 430 (Much Decl. ¶ 36)). Much's team planned more than 1,000 SKU variations every month. (J.A. Vol. II 430 (Much Decl. ¶ 36)). Much had no regular insight into customer-specific demand and did not know customer-level pricing. (J.A. Vol. II 430 Much Decl. ¶ 37)).

Much's team would then take those forecasts and work with Fresenius Manufacturing's plants to determine how much product should be manufactured and where. (J.A. Vol. II 430 (Much Decl. ¶ 37)). Decisions about manufacturing location were based on plant capacity as communicated by the plants, and the location where the product needed to be delivered to "shorten" the supply chain and ensure products

reached customers efficiently and on time. (J.A. Vol. II 422-23, 429-30 (Much Decl. ¶¶ 15, 35-37)).

Much's team scheduled deliveries of the finished product to the end users using third-party carriers. (J.A. Vol. II 425 (Much Decl. ¶ 27)). Fresenius Manufacturing completely outsourced delivery to hundreds of carriers that had complex pricing schedules that varied by route (*i.e.*, "lanes") and season. (J.A. Vol. II 425 (Much Decl. ¶ 27)). Much's team would compare rates, availability, and locations across the contracted carriers to select the proper carrier for delivery. (J.A. Vol. II 425 (Much Decl. ¶ 27)).

Because Much's team was responsible for more than 1,000,000 shipments each year, and because there were thousands of possible pricing combinations applicable over the course of a year, Much does not remember those prices. (J.A. Vol. II 425 (Much Decl. ¶ 27)). Rather, the prices were loaded into a software application that analyzed the cost across contracts each time a delivery was scheduled. (J.A. Vol. II 425 (Much Decl. ¶ 27)). Much did not design that software and did not have access to any proprietary code; he was simply a user of software. (J.A. Vol. II 425 (Much Decl. ¶ 27)).

The supply-chain principles and practices Much employed at Fresenius Manufacturing are generally known in the supply-chain profession, taught in industrial engineering programs across the United States, and employed across

multiple industries. They are a product of Much's nearly three decades of experience. (J.A. Vol. II 418-23 (Much Decl. ¶¶ 4-15)). Much's value lies in how—with his nearly three decades of experience—he applies them to the unique characteristics of his employer. (J.A. Vol. II 422-23 (Much Decl. ¶ 15)).

## V. The Alleged Trade Secret Information is Not Confidential Or Useful to Vantive

Appellee submitted declarations from Brett Beck, Brent Melancon, and Almasa Lauredant purporting to outline confidential and other information that Much accessed as part of his role. (J.A. Vol. I 320, Vol. II 350, 374). Much and James Prutow (Vantive's Chief Transformation Officer) submitted affidavits to explain why the information was not confidential and/or would not provide any competitive value to Vantive. (J.A. Vol. II 417, 463, S.A. 55).

### A. Fresenius Manufacturing's Supposed Supply Chain Strategy Was Not Confidential or Unique to Fresenius Manufacturing

Fresenius Manufacturing's submissions to the district court suggest that Much had access to its confidential supply chain strategy. Much disputed that assertion, noting first that Fresenius Manufacturing did not have a single, global supply chain strategy. (J.A. Vol. II 425-36 (Much Decl. ¶ 28)). Rather, its strategy varied by region, and he was privy only to the strategy for the Americas. (J.A. Vol. II 425-26 (Much Decl. ¶ 28)). Much also vigorously disputed that Fresenius Manufacturing was employing any unique or novel strategy in the Americas. (J.A. Vol. II 425-26

(Much Decl. ¶ 28)).

When Much arrived at Fresenius Manufacturing, it was using a vertically integrated model in which it manufactured, transported, and distributed all of its products without the assistance of third-party logistics providers ("3PLs"). (J.A. Vol. II 426 (Much Decl. ¶ 30)). This was inefficient, so Fresenius Manufacturing decided to outsource these functions. (J.A. Vol. II 425-26 (Much Decl. ¶ 30)). Much led this outsourcing transformation, but without using any proprietary or secret Fresenius Manufacturing approach.

To the contrary, outsourcing initiatives had been a central focus of Much's career and are part of the expertise he brought to Fresenius Manufacturing. (J.A. Vol. II 427-28 (Much Decl. ¶¶ 32-33); S.A. 65-66 (Much Decl. ¶¶ 32-33)). Much used well-known principles he learned over his 30-year career in aerospace and defense, which are also taught in business schools around the world. (J.A. Vol. II 417-23 (Much Decl. ¶¶ 2-15)).

The decision to outsource was also no secret: FME publicly announced the decision to third parties, to its employees, and in a series of press releases. (J.A. Vol. II at 426-27 (Much Decl. ¶ 31)). For example, as Much attested, documents attached to Melancon's declaration—which purportedly contained highly confidential supply chain strategy—merely illustrate the status of those outsourcing efforts and reveal less information than Medical AG discloses publicly. (J.A. Vol. II 428-29 (Much

Decl. ¶ 34); S.A. 66 (Much Decl. ¶ 34)).

### B. Much was Not Privy to Confidential Information During Sales, Inventory, & Operations Planning ("SIOP") Meetings

The Beck and Lauredant declarations allege that Much had access to confidential SIOP information and strategy that would be useful to him at Vantive. Much countered these assertions. His declaration described that the SIOP meetings he attended, and supporting documents used during those meetings, merely provided a high-level overview of performance metrics and supply-chain concerns familiar to and faced by virtually every major company.

The SIOP information discussed in the Beck and Lauredant declarations focused on whether customer demand had been accurately forecasted, whether sufficient inventory was available to meet demand, and what operational adjustments should be made when forecasts proved inaccurate. Much's sworn declaration explained how these concepts and issues were known beyond Fresenius Manufacturing and the healthcare industry. (J.A. Vol. II 431-32 (Much Decl. ¶¶ 41-42); S.A. 69-70, (Much Decl. ¶¶ 41-42).

### C. Fresenius Manufacturing's Outsourcing and SIOP Strategy Are Not Valuable to Vantive

Much and Prutow also submitted declarations explaining why none of the supposed confidential information would be useful to Vantive. Demand planning and logistics is inherently tethered to the specific location and capacity of each

company's manufacturing plants, warehouses, and distribution centers as well as the location and type of customers (*e.g.,* a dialysis center which takes pallets versus a home patient who takes individual shipments). (J.A. Vol. II 422-23 (Much Decl. ¶ 15); 464-65 (Prutow Decl. ¶¶ 4-8)).

Of course, Vantive's plants, warehouses and distribution centers are in different locations than those of Fresenius Manufacturing, so Fresenius Manufacturing's logistics information would not be helpful to Vantive. (J.A. Vol. II 434-35 (Much Decl. ¶ 48)). How Fresenius Manufacturing plots out its "last mile" logistics from its specific facilities at certain locations does not correlate to how Vantive plots out *its* logistics from *its* specific facilities at *different* locations. And, how much inventory Fresenius Manufacturing maintains at any one of its facilities is irrelevant to how much inventory Vantive maintains at any one of *its different* facilities.

Additionally, a substantial portion of Fresenius Manufacturing business is supplying dialysis centers (FME's and DaVita's). In contrast, Vantive's business is largely focused on the peritoneal dialysis ("PD") market, where patients receive dialysis in their home. (J.A. Vol. II 464-65 (Prutow Decl. ¶¶ 4-9)). Vantive uses its own fleet of trucks and directly employed drivers to perform the final "last mile" leg of delivery for approximately 95% of home PD patients. (J.A. Vol. II 464-65 (Prutow Decl. ¶ 7)).

Vantive is focused on providing a "white glove" service. (J.A. Vol. II 465 (Prutow Decl. ¶ 8)). Vantive's drivers regularly service the same patients and, over time, many drivers become close with patients on their routes. (J.A. Vol. II 465 (Prutow Decl. ¶ 8)). The mechanisms and strategy for how Fresenius Manufacturing delivers copious quantities of products on pallets to a dialysis center are drastically different from how Vantive delivers supplies to an individual patient's home. (J.A. Vol. II 464-65 (Prutow Decl. ¶¶ 4-9)).

### D. Fresenius Manufacturing's Alleged Future Strategy is Public

Fresenius Manufacturing's submissions in the district court argue that Much knew about its supposedly secret plans to improve its supply chain on a go-forward basis. Much disputed this allegation in his declaration. FME has grown through acquisitions around the world, resulting in legacy locations and subsidiaries using different systems to track finances, sales, and inventory. (J.A. Vol. II 432-33 (Much Decl. ¶ 43)). These systems could not communicate with each other, creating inefficiencies and errors. (J.A. Vol. II 432-33 (Much Decl. ¶ 43)). FME thus made the decision to transition to SAP so that it would have a single system for managing finances, sales, and inventory. (J.A. Vol. II 433 (Much Decl. ¶ 44)).

Lauredant's declaration and attending exhibits show that Much's role in that effort, [redacted] focused on ensuring that ongoing outsourcing initiatives were completed and stabilized before the SAP rollout. (J.A. Vol. II 433-

34 (Much Decl. ¶ 45); S.A. 71-72 (Much Decl. ¶ 45)). FME widely publicized its intent to transition to SAP; this was not a secret strategy. (J.A. Vol. II 433 (Much Decl. ¶ 44)). Moreover, the transition and information about it is useless to Vantive because Vantive does not use SAP; it licenses software from a different provider. (J.A. Vol. II 433-35 (Much Decl. ¶¶ 44, 48)).

### E. The "PD Turnaround Project" is Public Information

Fresenius Manufacturing also has claimed that Much participated in certain discussions relating to FME's "PD Turnaround Project," [redacted] (J.A. Vol. II 435 (Much Decl. ¶ 49); S.A. 73 (Much Decl. ¶ 49)). The supporting declarations generically state that Much heard information from other divisions in the company about new product releases and additional initiatives to improve profitability which he would inevitably use to Vantive's benefit. (J.A. Vol. II 354-55 (Melancon Decl. ¶¶ 11-17)).

Again, Much disputed these allegations in his sworn declaration. [redacted] (J.A. Vol. II 435 (Much Decl. ¶ 49); S.A. 73 (Much Decl. ¶ 49)). He was not responsible for nor privy to manufacturing strategy, product design, regulatory

strategy, commercial strategy, pricing, procurement, or other aspects of the initiative. (J.A. Vol. II 435 (Much Decl. ¶ 49); S.A. 73 (Much Decl. ¶ 49)).

When Much attended cross-functional meetings where such topics may have been discussed, he was often excused after reporting on his area of responsibility and did not remain for discussions concerning other functions of the business. (J.A. Vol. II 435 (Much Decl. ¶ 50)). On rare occasions when he did remain, the information he was exposed to was publicly available in Medical AG's SEC filings. (J.A. Vol. II 435-40 (Much Decl. ¶¶ 51-52)).

### F. Much Had Only Limited Interactions with Customers

Fresenius Manufacturing stated that, on occasion, Much had interacted with DaVita (which is both a competitor and customer) by giving tours of Fresenius Manufacturing's distribution centers and explaining Fresenius Manufacturing's supply chain performance. (J.A. Vol. II 360-69 (Melancon Decl. Ex. B and C); S.A. 5-16 (Melancon Ex. B)). Fresenius Manufacturing suggested that because Much knew key people at DaVita, he could leverage that relationship for Vantive's benefit, as Vantive also supplies DaVita with certain products. But Much had no sales or marketing responsibility at Fresenius Manufacturing and would have no sales or marketing responsibility at Vantive.

In any event, Much explained in his declaration that he merely provided DaVita with a tour and explained Fresenius Manufacturing's delivery performance

statistics. (J.A. Vol. II 424 (Much Decl. ¶ 22)). Further, his customer interactions at Fresenius Manufacturing were limited to troubleshooting why product had not arrived at all or in full.

Plus, Much's offer letter from Vantive expressly required that he comply with the non-solicitation and confidentiality provisions in his PCAs. There is no evidence that those provisions were inadequate to protect Fresenius Manufacturing, especially given Much's insignificant interaction as a tour guide for DaVita (a far cry from managing an actual customer relationship). (J.A. Vol. II 446, 449-50 (Much Decl. ¶ 71, 73 & Ex. A)).

## VI. Fresenius Manufacturing Offers Much a Promotion and Then Retracts It

In February 2026, Much's direct superior, Brett Beck, told Much that Fresenius Manufacturing was considering promoting him to Global Senior Vice President of Supply Chain. (J.A. Vol. II 440-41 (Much Decl. ¶¶ 53-54)). Later in April 2026, Luigi Sorrentino, Executive Vice President of Manufacturing and Supply Chain, confirmed that Fresenius Manufacturing intended to move forward and planned to announce the promotion on June 1, 2026, with an anticipated effective date of July 1, 2026. (J.A. Vol. II 441 (Much Decl. ¶ 55)).

When Sorrentino finally made a verbal offer with compensation terms on May 20, 2026 (J.A. Vol. II 441 (Much Decl. ¶ 57)), Much thought the offer did not appropriately reflect the scope of the role or prevailing market compensation rates.

(J.A. Vol. II 441 (Much Decl. ¶ 57)). Much never received a written offer. (J.A. Vol. II 441 (Much Decl. ¶ 55)).

On May 19, 21, and 22, 2026, Much met with Joe Turk ("Turk"), the President of Care Enablement. Much expressed his frustration with the prolonged uncertainty regarding the possible promotion and proposed compensation. (J.A. Vol. II 441-42 (Much Decl, ¶ 58)). Much told Turk that he was exploring other opportunities, including with Vantive. (J.A. Vol. II 442 (Much Decl. ¶ 59)).

Turk asked Much to discontinue those discussions while he worked to resolve the promotion issues and suggested that Much counter the compensation terms. (J.A. Vol. II 442 (Much Decl. ¶¶ 59-60)). On May 22, 2026, Much submitted a counterproposal. (J.A. Vol. II 442 (Much Decl. ¶ 60)). But, Much did not commit to discontinuing his job search efforts. (J.A. Vol. II 442 (Much Decl. ¶ 59))

Much continued dutifully performing his responsibilities to Fresenius Manufacturing, including participating in several routine meetings. (J.A. Vol. II 442-3 (Much Decl. ¶ 61)). Neither Turk nor anyone else told Much not to attend the meetings or (to Much's knowledge) restricted his access to any information. (J.A. Vol. II 442-3 (Much Decl. ¶ 61)).

Several weeks later, Fresenius Manufacturing rejected Much's counterproposal. (J.A. Vol. II 443 (Much Decl. ¶ 62)). Turk then told Much that Fresenius Manufacturing would not be promoting him into the Global Senior Vice

President of Supply Chain role at all, reneging on the company's earlier offer. (J.A. Vol. II 443 (Much Decl. ¶ 62)).

## VII. Much Accepted a Position at Vantive Only After Fresenius Manufacturing Reneged on Its Offer to Promote Him

Much received a written offer from Vantive on July 14, 2026 and accepted it on July 16, 2026. (J.A. Vol. II 443-44 (Much Decl. ¶¶ 63-64)). Within approximately one hour of doing so, Much told Fresenius Manufacturing that he was resigning and joining Vantive, gave two-weeks notice, and offered to assist with transition activities. (J.A. Vol. II 443-44(Much Decl. ¶ 64)).

Fresenius Manufacturing declined Much's offer of transition support, and within one hour of receiving his resignation, relieved him of his duties and disabled his access to company systems. (J.A. Vol. II 444 (Much Decl. ¶ 65)). With no ability to conduct further work for the company, on July 24, 2026, Much notified Fresenius Manufacturing that he planned to accelerate his departure date because it appeared not to need his assistance with the transition. (J.A. Vol. II 444, 449-50 (Much Decl. ¶ 66 & Ex. A)). Fresenius Manufacturing did not respond. (J.A. Vol. II 444 (Much Decl. ¶ 66)).

## VIII. Much Takes On a Substantially Different Role at Vantive

Much's employment with Vantive began on July 28, 2026. (J.A. Vol. II 446 (Much Decl. ¶ 72)). As Executive Vice President and Chief Supply Chain Officer, Much reported directly to Vantive's CEO, Chris Toth. (J.A. Vol. II 466 (Prutow Decl.

¶ 11)). The contrast between Much's two roles is unmistakable:

- At Fresenius Manufacturing, Much was a regional Vice President responsible only for demand planning and logistics, led an organization of approximately 450 employees, and sat four layers below the CEO. (J.A. Vol. II 424-25, 446 (Much Decl. ¶¶ 24, 26, 74)).
- At Vantive, Much served as Executive Vice President and Chief Supply Chain Officer. He reported directly to Vantive's CEO, Chris Toth, led approximately 13,000 employees worldwide, and had responsibility for procurement and manufacturing strategy across the globe—functions he never performed at Fresenius Manufacturing. (J.A. Vol. II 446 (Much Decl. ¶¶ 72-74).

The largest part of Much's job at Vantive was to oversee manufacturing plants outside of the Americas, which employ about 9,000 of Vantive's 12,800 full-time manufacturing employees. (J.A. Vol. II 466-67 (Prutow Decl. ¶ 13)). Although Much also had ultimate oversight of logistics strategy to coordinate such strategy across all Vantive regions, he was not responsible for day-to-day demand planning and logistics activities within the Americas, as he had been at Fresenius Manufacturing. (J.A. Vol. II 446-47 (Much Decl., ¶¶ 75-77); J.A. Vol. II 467-68 (Prutow Decl. ¶¶ 14-16)). Those functions were managed by regional organizations within Vantive that did not report to Much. (J.A. Vol. II 446-47 (Much Decl. ¶¶ 75-77); J.A. Vol. II

467-68 (Prutow Decl. ¶¶ 14-16)).

Before Much's employment with Vantive began, Much and Vantive took steps to ensure that Much would not disclose, or be perceived as being able to disclose, FME's confidential, proprietary, or trade-secret information. For example, Much's offer letter (which Much signed) acknowledged that Much executed a PCA with "a subsidiary of Fresenius Medical Care Holdings, Inc." on July 28, 2025. (J.A. Vol. II 457-62, (Much Decl., Ex. C)). Vantive required that Much promise to comply with his obligations in that PCA, including returning company property, protecting FME confidential information, and refraining from using or disclosing such information to Vantive. (J.A. Vol. II 446, 457-63 (Much Decl. ¶ 71, Ex. C). Much did so. (J.A. Vol. II 446 (Much Decl. ¶ 71)).

Much also undertook considerable preservation and remediation efforts to ensure that no potentially sensitive FME information was in his possession before his first day at Vantive. (J.A. Vol. II 444-46 (Much Decl. ¶¶ 67-71)). He identified a limited amount of information residing in certain personal accounts and devices and proactively asked Fresenius Manufacturing how it wanted that information to be handled. (J.A. Vol. II 444-46 (Much Decl. ¶¶ 67-71)). When it did not respond, Much retained Charles River Associates ("CRA") to image and collect data from all potentially relevant sources and removed all potentially sensitive company information from those sources—all before commencing employment with Vantive.

(J.A. Vol. II 445-46 (Much Decl. ¶ 70)). Only CRA has access to the images. ((J.A. Vol. II 445-46 (Much Decl. ¶ 70)); 472 (Roffman Decl. ¶ 10)).

## PROCEDURAL HISTORY

On August 5, 2026, Fresenius Manufacturing filed a complaint against Much for breach of contract and misappropriation of trade secrets under federal and Massachusetts law, along with a motion for a temporary restraining order and a preliminary injunction to prevent Much from continuing his employment with Vantive. (J.A. Vol. I 13, 96, 100). The district court held argument on Fresenius Manufacturing's motion on August 25, 2026, during which the parties and the district court proceeded solely on Fresenius Manufacturing's request for a preliminary injunction. The district court did not conduct an evidentiary hearing.

On August 31, 2026, the district court issued a Memorandum and Order granting Fresenius Manufacturing's request for a preliminary injunction (*see generally* Add. 2-18). On September 4, 2026, Much requested clarification of certain portions of the court's Memorandum and Order, including regarding the scope of the injunction and the extent to which it prohibited him from performing duties that do not overlap with his former position at Fresenius Manufacturing. (J.A. Vol. II 584-85). (*Id.*). On September 10, 2026, the district court denied Much's request and entered an Order of Injunction. (J.A. Vol. I 11, Vol. II 647). This appeal followed. (J.A. Vol. I 10).

## SUMMARY OF THE ARGUMENT

The district court's Order of Injunction should be reversed for four independent reasons.

***First***, the district court misconstrued the MNAA by enforcing a noncompete that extends protection beyond Much's actual "employer," Fresenius Manufacturing, to the entire FME conglomerate of more than 1,450 affiliated and related entities that never employed him. The district court's conclusion that Fresenius Manufacturing was a signatory to the agreement does not answer the threshold question of whether the MNAA permits that employer to invoke the broader interests of 1,450 affiliates that never employed Much, and the statute's text, structure, and purpose confirm it does not.

***Second***, the district court excused Fresenius Manufacturing from the MNAA's independent requirement that a noncompete be "no broader than necessary" to protect the employer's legitimate interests. Such necessity exists only where an alternative restrictive covenant—such as a confidentiality or non-solicitation agreement—would be inadequate. Yet, the district court found a likelihood of success without ever addressing whether or determining that the confidentiality and non-solicitation provisions already in the same agreement were insufficient to protect Fresenius Manufacturing's interests.

***Third***, the district court impermissibly resolved sharply disputed issues of material fact—concerning both Much's alleged breach and Fresenius Manufacturing's claimed irreparable harm—in Fresenius Manufacturing's favor without holding an evidentiary hearing. Much submitted detailed, specific declarations rebutting Fresenius Manufacturing's generalized assertions regarding supply chain strategy, the PD Turnaround Project, and customer interactions, yet the district court adopted Fresenius Manufacturing's version of events without testing the evidence at a hearing.

***Fourth***, the Order of Injunction fails to satisfy Rule 65(d) in numerous ways. It violates the Rule's specificity requirements because it bars Much from holding a particular job title at Vantive rather than describing the specific conduct restrained, leaving Much and Vantive unable to determine which duties would place him in contempt. The Order violates Rule 65(d)'s prohibition on incorporating documents by reference because it enjoins Much from using confidential information and trade secrets as defined by the PCAs. And, the Order violates Rule 65(d) by imposing restrictions divorced from any evidence, because it orders Much to identify and return confidential information when Fresenius Manufacturing presented and the district court found no evidence that Much retained, disclosed, or used any of its confidential information or trade secrets. By imposing affirmative obligations and

restrictions untethered to any proven misconduct, the injunction impermissibly restrains lawful conduct based on speculation alone.

Any one of these four independent errors warrants reversal of the preliminary injunction entered on September 10, 2026.

## STANDARD OF REVIEW

The standard of review of a district court's decision to grant a preliminary injunction depends on the precise issue under consideration. *E.g.*, *Otis Elevator Co. v. Int'l Union of Elevator Constructors*, 408 F.3d 1, 7 (1st Cir. 2005). Here, four issues of law underpin Much's appeal, all of which must be reviewed *de novo*: (1) the district court's construction of the MNAA's definition of "employer"; (2) the district court's construction of the MNAA with respect to the "necessity" of a noncompete to protect Fresenius Manufacturing's confidential information and trade secrets; (3) the district court's decision to resolve materially disputed factual issues without an evidentiary hearing; and (4) the Order of Injunction's failure to "describe in reasonable detail . . . the act or acts restrained or required" under Fed. R. Civ. P. 65(d)(1), or any detail at all. *See Langlois v. Abington Housing Auth.*, 207 F.3d 43, 47 (1st Cir. 2000) (construction of statute is question of law); *Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 893-94 (1st Cir. 1988) (reviewing *de novo* issue of whether district court improperly granted preliminary injunction without holding evidentiary hearing); *Sanchez v. Esso Standard Oil Co*., 572 F.3d 1, 19-20 (1st Cir. 2009)

(holding that the district court's failure to comply with "the requirements of Rule 65(d)(1)[] was a clear error of law.").

## ARGUMENT

### I. The District Court Erred When It Construed the MNAA To Allow Appellee to Extend Protection to 1,450 Entities Beyond Much's Employer

The district court concluded that Fresenius Manufacturing was likely to prevail on the merits based on a misconstruction of the MNAA. The district court held that Fresenius Manufacturing could extend protections of its confidential information and goodwill across the entire "FME ecosystem" because "Much interacted with all corporate divisions within Care Enablement," a subset of that ecosystem. (Add. 13).

That conclusion was wrong for several reasons. *One*: it conflicts with the plain language of the MNAA, which expressly requires a noncompete go no further than protecting "the employer's" interest. G.L. c. 149 § 24L(b)(iii). *Two*: the court should have followed the well-reasoned opinion by the Massachusetts Superior Court in *Anaplan*, which held that extending protection to the employer's parent company violates this enforceability requirement, and thus invalidates a noncompete agreement. *See Anaplan Parent, LP v. Brennan*, No. 2584V02350 (Mass. Super. Ct. Sept. 15, 2025). *Three*: the district court's efforts to distinguish *Anaplan* further misapplied the MNAA and impermissibly created judicial exceptions to the statutory mandate.

### A. The Plain Language of the MNAA Renders the Covenant Invalid

Under the MNAA, a noncompete agreement is enforceable only if it "meet[s] the minimum requirements of paragraphs (i) through (viii)," which provide, in relevant part, that the noncompete be limited to the actual employer:

> (i) & (ii) . . . the agreement must be in writing and signed by both the **employer** and employee . . . .
>
> (iii) The agreement must be no broader than necessary to protect one or more of the following legitimate business interests **of the employer**: (A) **the employer's** trade secrets; (B) **the employer's** confidential information . . . or (C) **the employer's** goodwill. . .

G.L. c. 149 § 24L(b).

Much's "Employer" entity is not identified in the PCAs. Instead, the PCAs state only that they are between Much and an unnamed Holdings subsidiary, defined as the "Employer." (J.A. Vol. I 75). But the PCAs then separately define the "Company" to include the "Employer and its related/affiliated companies."[2] (J.A. Vol. I 75, § 1).

The confidentiality provisions in Section 3 and the protective covenants in Section 5 extend beyond Much's actual employer to the entire "Company."

- Section 3 defines confidential information as "information or a compilation of information in any form . . . belonging to the Company." (emphasis added). (J.A. Vol. I 75-6, § 3).

[2] "Affiliate" is a term of art defined by SEC rules and includes parents, subsidiaries, and sister companies or any entity that is under common control with another. (Securities Act Rule 405 and Exchange Act Rule 12b-2).

- Section 5(b) precludes Much from working in a substantially similar role for a Competing Business, which is further defined in Section 5(a)(1) to include any person or entity that competes "with any business that the Company conducts." (J.A. Vol. I 79, § 5(a)(i)).

Section 6 goes even further, making "each of the Employer's related/affiliated entities . . . a third-party beneficiary to this Agreement with standing to enforce any of its provisions." (J.A. Vol. I 83. § 6).

Fresenius Manufacturing's Fed. R. Civ. P. 7.1(a) disclosures confirm that the "Company" encompasses Fresenius Manufacturing's "***ultimate*** parent company," Medical AG (J.A. Vol. I 94) (emphasis added). That "ultimate parent company" operates through more than 1,450 legal entities around the world and in many different business lines. (*See* J.A. Vol. II 473-539 (McConnell Decl., Ex. A)). Much had nothing to do with the vast majority of these legal entities and business lines, which conducted operations like running dialysis centers or advancing renal care initiatives around the globe. Much worked only for Fresenius Manufacturing, and his duties and responsibilities were limited to the business that manufactures and delivers dialysis products in limited geographic regions.

Fresenius Manufacturing's moving papers in the district court confirm its illicit objective to protect not just its purported confidential information and trade secrets, but also that of FME's more than 1,450 global affiliates and subsidiaries. This is equally evident in its sworn declarations, which refer generically to

confidential information, customers, and strategic initiatives of FME or the Care Enablement division. For example:

- Beck attested that Much attended some meetings which "[laid] out **FME's highest-level corporate strategies**" (J.A. Vol. I 325 (Beck Decl. ¶17)) or wherein he "learned information impacting [FME] **Care Enablement** globally." (J.A. Vol. I 328-29 (Beck Decl. ¶ 26)).

- Beck also attested that Much worked on a global project to modernize **Care Enablement's** network, which would give a competitor the ability "to adjust its strategies to exploit non-public **FME information**." (J.A. Vol. I 329 (Beck Decl. ¶ 27)).

- Melancon declared that unspecified "highly confidential information and strategies related to **FME's PD Business** were discussed" during a meeting on June 8, 2026, which Much attended. (J.A. Vol. II 354 (Melancon Decl. ¶ 12)).

At the same time that the PCA's (and Fresenius Manufacturing's moving papers) seek to preclude Much from competing with the entire FME conglomerate, FME affirmatively denies these entities are Much's (or any other signatory's) employer. Indeed, when defending against employment claims in other litigation, FME has repeatedly insisted when it is defending against employment claims in other litigation that its corporate affiliates are legally distinct and that parent companies are not joint employers of subsidiary employees:

- "[Holdings] has no employees and Plaintiff fails to allege plausible facts supporting her conclusion that [Holdings] and RCG are joint employers." *Laughlin v. Fresenius Med. Care Holdings, Inc*., Case No. 2:23-cv-00180 (E.D. Wash. Aug. 24, 2023) (ECF No. 16).

- "Plaintiff pleads no facts to suggest [Holdings] was his employer under Pennsylvania law; he instead asks this Court to speculate that [Holdings] may be liable based on an alleged, indirect parent-subsidiary relationship with BMA." *Ortman v. Bio-Med. Applications of Pa., Inc.*, Case No. 1:24-cv-11599 (D. Mass. Aug. 15, 2024) (ECF No. 21 at 1).

Here, Fresenius Manufacturing never actually asserted, nor did the district court find, that any other entity jointly employed Much.[3] This is because FME deliberately wrote the PCA to allow it to have its cake and eat it too. When defending employment claims, it insists that each affiliate is a separate legal entity and that parent companies are not employers. But, when seeking to enforce a noncompete, it asks the court to disregard those distinctions and extend employer protections across an enterprise consisting of more than 1,450 separate entities.

The MNAA does not permit such a result. FME cannot invoke corporate separateness to avoid the obligations of an employer while simultaneously disregarding those same corporate boundaries to obtain restrictive covenant protections reserved for employers.

### B. The Court Should Have, But Failed to Follow *Anaplan*

In *Anaplan*, the Superior Court expressly rejected efforts by a parent company to extend protections beyond the employer to affiliated companies. *See Anaplan*

[3] In light of its position in other litigation, Fresenius Manufacturing and Holdings would be estopped from doing so now. *See Díaz-Báez v. Alicea-Vasallo*, 22 F.4th 11, 21-22 (1st Cir. 2021) (judicially estopping litigants from reversing prior position after persuading another court to accept that prior position).

*Parent, LP v. Brennan*, No. 2584CV02350 (Mass. Super. Ct. Sept. 15, 2025).[4] There, the employer's parent corporation issued the defendant an equity grant. That agreement was between the employee and the parent corporation and included a noncompete provision barring the employee from competing with his employer. After the employer moved to enforce that noncompete, the employee argued that the agreement was null and void because his employer was neither a signatory nor a party to the agreement. The trial court agreed, noting that the MNAA's prohibition on extending restrictions beyond the legitimate business interests of the employer serves an important public policy interest and is not a waivable violation:

> Including a parent corporation (or grand, great, etc.) would seemingly frustrate the purposes of the statute as it could . . . allow the "employer" to invoke the much broader business interests of parents, subsidiaries, and/or affiliates to enforce more onerous restrictions on the ex-employee. Those should not be read into the statute.

*Id.*[5] The district court should have followed *Anaplan*'s reasoning and invalidated Much's covenant.

---

[4] The MNAA vests exclusive jurisdiction over actions arising under the statute in Massachusetts state courts. *See* G.L. c. 149 § 24L(f). Although the Commonwealth cannot divest federal courts of jurisdiction, the Legislature's decision to channel MNAA disputes to the Massachusetts courts reflects an intent that those courts play the primary role in developing and applying the statute. As such, Massachusetts state court decisions regarding the enforceability of noncompete agreements are particularly instructive and warrant substantial consideration.

[5] The trial court's decision in *Anaplan* was appealed and, while that appeal was pending, transferred to the Supreme Judicial Court *sua sponte*. Oral argument was held on September 9, 2026 under Docket No. SJC-13917.

### C. The District Court's Efforts to Distinguish *Anaplan* Further Misapplied the MNAA and Impermissibly Created Judicial Exceptions

Instead of following *Anaplan*, the district court distinguished it, finding that Much's employer was a party to the agreement, and that his PCAs only prohibited him from working for competitors of the FME conglomerate if he was employed in a role similar to his prior role at Fresenius Manufacturing. This was neither a meaningful distinction nor a proper application of the MNAA.

***First***, the district court's observation that Fresenius Manufacturing is a party to Much's agreement misses the point. While that is a minimum requirement under the MNAA, the question Much presented—which the district court failed to answer—is whether it was permissible for Fresenius Manufacturing to extend those restrictions to 1,450 additional affiliated or subsidiary entities that indisputably never employed Much.

The answer to that question is "No." The MNAA expressly limits protection to Much's actual employer. This is part of the paradigm shift in MNAA, a shift that this Court recently acknowledged:

> [T]he MNAA "represents a *paradigm shift* in *favor* of *employees*" that "dramatically reduc[ed] the number of Massachusetts employees who can be subjected to . . . enforceable" noncompetes, while offering those covered by them "stronger substantive and procedural protections than in the past" and likewise "limit[ing]" employers "to substantially reduced post-employment restrictions."

*DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 422 (1st Cir. 2024) (quoting Jerry Cohen et al., *Employee Noncompetition Laws and Practices: A Massachusetts Paradigm Shift Goes National*, 103 MASS. L. REV. 31, 31 (2022)).

Limiting the covenant to the employer's legitimate interests also serves a basic notice and fairness function. An employee like Much can evaluate the business, customers, and information only of the entity that employs him. He cannot identify all 1,450 entities in a global conglomerate, *determine what businesses each conducts or may later conduct,* or know which of those businesses could make a future employer a "Competing Business." *See Fortiline, Inc. v. McCall*, 2024 WL 4088629, at *4 (Del. Ch. Sept. 5, 2024); *Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022) (same).

***Second***, the district court erred when it rationalized that it was fair, and therefore permissible, for Fresenius Manufacturing to extend Much's restrictions to unnamed and unknown affiliates because Much is prohibited only from working for competitors in roles substantially similar to the one he held at Fresenius Manufacturing. That extra-textual gloss is impermissible legislating. The MNAA includes no such exception, and the district court was without power to judicially create one. *See Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125 (2002) (reversing Ninth Circuit *en banc* decision because the court read requirements into

the statute that were not supported by the plain language; a court cannot judicially alter the elements of a claim).

Section 24L(b)(vi) of the MNAA addresses the scope of activities that may be proscribed; Section 24L(b)(iii) addresses a separate and distinct issue—whose interests the covenant may protect and whether a noncompete is necessary at all. The latter inquiry cannot be satisfied by pointing to a favorable answer to the former. Here, the statutory protection was impermissibly abrogated.

* * *

The district court's analysis should have started and ended with a simple question: does the MNAA permit an employer to use a noncompete to protect the goodwill and confidential information of 1,450 related and affiliated companies that do not employ the individual? Because the MNAA plainly answers that question in the negative, the covenant is unenforceable and Appellee is not entitled to an injunction.

## II. The District Court Erred When It Construed The MNAA To Enforce A Restrictive Covenant Without Proof That It was "*Necessary*"

The district court's opinion relies on a second misconstruction of the MNAA. Section 24L(b) of the MNAA states that "[t]o be valid and enforceable, a noncompetition agreement must meet the minimum requirements of paragraphs (i) through (viii)." All *eight* of those requirements must be met. But, the district court did not address the third requirement, which mandates that a noncompete provision

can be "no broader than **necessary** to protect . . . the employer's trade secrets . . . confidential information . . . [or] goodwill." G.L. c. 149 § 24L(b)(iii) (emphasis added). The MNAA further narrows that necessity to instances "where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant [such as] a non-solicitation agreement or a non-disclosure or confidentiality agreement." *Id*.

This third requirement reflects the MNAA's "paradigm shift" *in favor of employees* as recognized in *DraftKings*. While this statute protects an employer's legitimate interests, it does not permit an employer to convert general professional expertise into a proprietary asset or to prevent ordinary competition without showing why narrower protections will not suffice: "An employee upon terminating his employment may carry away and use the general skill or knowledge" that they "acquire[] during the course of the employment." *Danieli & O'Keefe Assocs. v. Braverman*, 1994 WL 879855, at *4 (Mass. Sup. Ct. Jan. 20, 1994) (recognizing that "[a]n employee upon terminating his employment may "use that superiority for the benefit of rivals in trade of [their] former employer").[6]

[6] In this respect, the MNAA restates long-standing public policy protecting an employee's ability to move from job to job without restrictions that are not narrowly tailored to protect a legitimate interest. *Club Aluminum Co. v. Young*, 263 Mass. 223, 225, 160 N.E. 804 (1928); *ISO Claims Partners, Inc. v. Cassavoy*, 2017 WL 2233502 (Mass. Super. Ct. Mar. 20, 2017).

Massachusetts courts interpreting the MNAA require an evidentiary showing that the former employee "is in a position 'where he can harm' the company by use of its trade secrets or confidential information," such that the employer's legitimate business interest cannot be adequately protected through an alternative restrictive covenant, such as a confidentiality agreement. *See*, *e.g.*, *Hyannis Port Rsch., Inc. v. Gonzales*, 2022 WL 17999498, at *4 (Mass. Super. Ct. Dec. 23, 2022) (denying preliminary injunction because plaintiff failed to show that employee would inevitably use or disclose trade secrets in new role).

This principle is linked to the long-standing distinction between general skills and knowledge, which an employee may use after leaving, and an employer's protected trade secrets and confidential information:

> [The employee] may . . . have derived some benefit from his access to the collective experience of [his employer]. . . (experience to which . . [he] himself doubtless contributed significantly during the course of his employment). It is rather to say such information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analysis.
>
> Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself. It would disserve the free market goal of maximizing available resources to foster competition.

*Fleming Sales Co. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985) (internal citations omitted); *SH Franchising, LLC v. Newlands Homecare, LLC*, 2019 WL 356658, at *4-5 (D. Md. Jan. 29, 2019) (declining to enforce restrictive covenant where

employer sought to prevent former franchisee from offering related consulting services, emphasizing that "a confidential information agreement may not require individuals to act as if they have erased their memory. Instead, in Maryland, restrictive covenants on employment should be narrowly tailored to shield an employer's legally protectable interests." (internal citations omitted)); *GlobalTranz Enters. Inc. v. Murphy*, 2021 WL 1163086, at *5-7 (D. Ariz. Mar. 26, 2021) (holding that confidentiality provision was unenforceable where it effectively sought to "neuter all of Murphy's experience, knowledge, and skills acquired at GTZ to the point that it would be impossible for him to work in the third-party logistics industry again.").

Despite this clear statutory requirement in the MNAA, the district court never addressed why the confidentiality or non-solicitation provisions set forth in Section 3 of the PCAs would not adequately protect Fresenius Manufacturing's interests. The opinion is conspicuously silent on this point, even though the district court has recognized this obligation in other cases. *See, e.g.*, *NuVasive, Inc. v. Day*, 2019 WL 2287709, at *5 (D. Mass. May 29, 2019) (Casper, J.) (denying preliminary injunction to enforce restrictive covenant because plaintiff's attestation that defendants "could improve the marketability of Alphatec's . . . products by disseminating the confidential and proprietary information" was too conclusory and did not sufficiently explain how defendants would do so).

Instead, the district court reasoned that Much's noncompete complies with the MNAA because it prohibits Much from taking a substantially similar role with a competitor. That reasoning wrongfully conflates two different subparts of the MNAA: (1) Subsection (iii), mandating that the restriction be no broader than necessary to protect the employer's confidential information, and (2) Section (b)(vi), which separately provides that a covenant "limited to only the specific types of services provided by the employee at any time during the last 2 years of employment is presumptively reasonable."

The district court's observation that Much's covenant satisfies Section (b)(vi) impermissibly ignores analysis of whether the covenant separately satisfies Subsection (iii), the necessity standard. This violates the most basic tenet of statutory construction, that "every word and every provision is to be given effect." *Mundell v. Acadia Hospital Corp.*, 92 F.4th 1, 12 (1st Cir. 2024) (quoting Justice Antonin Scalia & Bryan A. Garner, *A Dozen Canons of Statutory and Constitutional Text Construction*, 99 JUDICATURE 2 (2015)).

Because the district court never determined whether confidentiality and non-solicitation obligations adequately protected Fresenius Manufacturing's interests, its likelihood-of-success finding cannot stand.

### III. The District Court Improperly Resolved Material Factual Disputes Without an Evidentiary Hearing

Beyond its flawed statutory construction of the MNAA, the district court further erred by improperly weighing evidence and adopting Fresenius Manufacturing's allegations, even though they were vigorously disputed by Much's counter evidence. This error alone requires vacating the injunction.

The district court concluded that Fresenius Manufacturing established a likelihood of success on the merits because Much had *access* to Fresenius Manufacturing's confidential information, which Vantive *could* use for its benefit. The district court went on to find irreparable harm with a solitary, conclusory gloss: "[i]t follows that Much will use his knowledge of FME's supply chain and strategies to the benefit of his former employer's direct competitor." (Add. 16).

These findings inherently reflect a credibility judgment of competing declarations and weighing of conflicting factual assertions made under oath by each side. That cannot stand. Where as here, "the parties' competing versions of the pertinent factual events are in sharp dispute, it is not appropriate to resolve those disputes in the movant's favor without an evidentiary hearing." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995).

In *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 224 (1st Cir. 2003), the First Circuit reversed and remanded a district court's denial of preliminary injunction

for crossing that boundary. There, too, the district court attempted to resolve disputed facts without an evidentiary hearing:

> The plaintiff vigorously asserts that she had all the statutorily required qualifications at the time of her original appointment and that the defendants are estopped, at this late date, from questioning her bona fides. The defendants, with equal vigor, assert the contrary. These are fact-intensive questions and the record is, for all practical purposes, bare as a new-born baby . . . Because the lower court had before it insufficient information of evidentiary quality to permit a reasoned determination as to likelihood of success, the alternative basis for denying the plaintiff's motion implodes.

*Id.*; *see also Ethicon, Inc. v. Angelini*, 687 F. App'x 859 (11th Cir. 2017) (vacating preliminary injunction in noncompete case because district court resolved disputed factual and credibility issues about defendant's access and potential to use confidential information at new employer without conducting evidentiary hearing); *Arrowpoint Capital Corp. v. Arrowpoint Asset Management, LLC*, 793 F.3d 313 (3d Cir. 2015) (vacating preliminary injunction and remanding for evidentiary hearing, noting that even though neither "party expressly asked for an evidentiary hearing . . . because consideration of the injunction motion evidently was influenced in some significant degree by credibility issues and factual disputes, the District Court should have conducted one.").

Here, Fresenius Manufacturing made conclusory allegations about Much's access to three categories of information belonging to the FME conglomerate generally: (1) past, current, and future supply chain strategy; (2) the "PD Turnaround

Project"; and (3) interactions with customers, including DaVita. Then, it merely surmised that such information could be valuable in Vantive's hands without a single fact-specific example of how that would occur and without addressing why Much's confidentiality and non-solicitation agreements might be insufficient to protect its interests.

To counter those surmises, Much presented a detailed 32-page declaration with 78 numbered paragraphs, and the 6-page sworn declaration of Prutow with 17 additional numbered paragraphs, that meticulously walked through:

(1) at Vantive, the vast majority of Much's responsibilities were overseeing manufacturing and procurement, two functions he did not oversee at Fresenius Manufacturing and for which he denies having any confidential information (J.A. Vol. II 446, (Much Decl. ¶ 73); 466-67 (Prutow Decl. ¶¶ 11-15));

(2) at Vantive, Much's responsibilities were global and involved territories beyond the scope of his contractual restrictions (J.A. Vol. II 446 (Much Decl. ¶ 73); 466-67 (Prutow Decl. ¶¶ 11-15)) ;

(3) at Vantive, Much had no roles in sales or marketing and therefore would not have customer-facing interactions to sell product (J.A. Vol. II 424-31 (Much Decl. ¶¶ 24-39); S.A. 62-69 (Much Decl. ¶¶ 24-39));

(4) the prophylactic measures that Vantive and Much took to ensure that Much returned or deleted all of his Fresenius Manufacturing information (J.A. Vol. II 444-45 (Much Decl. ¶¶ 67-71));

(5) the prophylactic measures that Vantive and Much took to ensure that Much did not disclose to Vantive any confidential information in the ordinary course of his job and complied with the confidentiality and non-solicitation provisions of the PCA (J.A. Vol. II 446, 457-62 (Much Decl. ¶ 71 & Ex. C);

(6) the generic nature of the information to which Much had access and his limited interactions with customers (*e.g.*, J.A. Vol. II 428-29, 435-36 (Much Decl. ¶¶ 33-34, 49-51); S.A. 66-67, 73-74 (Much Decl. ¶¶ 33-34, 49-51); and

(7) why any information about Fresenius Manufacturing's supply chain would be useless to Vantive, which operates factories, warehouses and distribution centers in different locations; has a business model that emphasizes home delivery over delivery to dialysis centers; and does not use SAP (J.A. Vol. II 422-23, 431-32, 434-35 (Much Decl. ¶¶ 15, 42, 48); S.A. 60-61, 69-70, 72-73 (Much Decl. ¶¶ 15, 42, 48); J.A. Vol. II 464-65 (Prutow Decl. ¶¶ 4-9)).

Unmistakably, the critical facts in this case are in dispute. The district court's Memorandum and Order nonetheless chose which evidence to believe without hearing from those witnesses in open court.

For example, the district court concluded that "Much and leaders from other FME divisions met quarterly to discuss the PD Turnaround Project and addressed strategies related to supply chain, manufacturing and commercial sales issues including future products, launch strategies, market and growth analyses, vendor relationships and FME's strengths and weaknesses in the PD business." (Add. 6). But that fact was specifically disputed:

| Appellee's Contentions | Much's Rebuttal |
|---|---|
| "PD Turnaround meetings that were held approximately every quarter," during which "we reviewed and discussed confidential information and ***strategies related to supply chain, manufacturing and commercial sales issues*** impacting the company's PD Business," including "***current and future products and strategies, product launch strategies, market analyses . . . , vendor relationships, FME's weaknesses and strengths within the business***, and competitive analyses." (J.A. Vol. II 353-54 (Melancon Decl. ¶ 10)). | [redacted] |

Similarly, the Court found that "on May 21, 2026, Much spoke at an Executive Manufacturing Supply Chain Project Review meeting about two projects he was leading. Both projects were confidential and involved strategies to change delivery methods and control costs for future 'enterprise transformations,' and other projects not known to the public involving future FME products were discussed at the same meeting." (Add. 5) (citations omitted) (quoting J.A. Vol. I 325-26 (Beck Decl. ¶¶ 18, 20)). Here again, this was a disputed issue of fact.

| Appellee's Contentions | Much's Rebuttal |
|---|---|
| "The last MSC Project Review meeting occurred on May 21, 2026. . . . Much spoke about two projects he was leading. One project was a confidential project addressing the final-mile delivery for products and our strategies to control the costs of delivery, which is expected to continue through the end of 2026. Another project is a confidential project involving the consolidation of certain operations and systems to support margin expansion and future enterprise transformations. The timeline for this project runs through Q1 2027. Both are confidential and if known by a competitor, like Vantive, would provide the competitor with an unfair competitive advantage because they would have the benefit of FME's investment in the strategies." (J.A. Vol. I 325-26 (Beck Decl. ¶ 18)). | "When I arrived at Fresenius Manufacturing, the company (in my region) used a vertically integrated model in which it manufactured, transported, and distributed all of its products without the assistance of any 3PLs . . . The company decided instead to outsource [logistics] functions. This initiative was publicly announced to many third parties and employees and was the subject of a series of press release . . . . These types of supply-chain transformation and outsourcing initiatives have been a central focus of mine throughout my career and reflect expertise and experience that I developed long before joining Fresenius Manufacturing." (J.A. Vol. II 426-28; S.A. 64-66 (Much Decl. ¶¶ 30-33)). |

In fact, at oral argument in the district court, Much's counsel used a PowerPoint demonstrative that walked through **side-by-side comparisons of 11 discrete examples of contradictions on material issues of fact.** (S.A. 154-64). Despite this litany, the district court nevertheless adopted Fresenius Manufacturing's account on virtually every material point without taking testimony. That approach transformed a preliminary proceeding into a paper trial on disputed facts. This was not a preliminary injunction case that could be decided on the papers, and therefore the lower court's decision should be reversed.

## IV. The Order of Injunction Violates Rule 65(d) by Lacking the Requisite Specificity, Referring to Other Documents, and Restraining Conduct Untethered to Record Evidence

Fed. R. Civ. P. 65(d)(1)(C) requires that "[e]very order granting an injunction. . . . state the reasons why it issued" and "describe in reasonable detail . . . the act or acts restrained or required" without "referring to the complaint or other document." Fed. R. Civ. P. 65(d)(1)(C). These requirements are "mandatory" and an order that fails to comply "should be set aside on appeal." *Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 7 (1st Cir. 2009). *Id.*

Compliance with this Rule serves two important functions:

> (1) prevent uncertainty and confusion on the part of those faced with injunctive orders, and thus avoid . . . a contempt citation on a decree too vague to be understood; and (2) enable an appellate tribunal to know precisely what it is reviewing. To that end, an injunction must be couched in specific and unambiguous terms, such that an ordinary

> person reading the court's order [is] able to ascertain from the document itself exactly what conduct is proscribed.

*Union Home Mortgage Corp. v. Cromer*, 31 F.4th 356, 363 (6th Cir. 2022) (internal quotations and citations omitted).

The district court's Order of Injunction violated all three of the requirements. *First*, the Order failed to describe the enjoined behavior with requisite specificity. *Second*, the restrictions improperly incorporated Much's PCA by reference. *Finally*, the Order included requirements related to allegations under the Massachusetts and Federal Trade Secret Act even though the district court affirmatively stated it was not reaching those claims.

### A. The Restrictions Lacked the Requisite Specificity

Appellee had initially asked the district court to enjoin Much from working for Vantive in any capacity, anywhere in the world. (*See* J.A. Vol. I 96-97). The district court's Order of Injunction stopped short of granting that request and instead enjoined Much from "[r]etaining his current employment as Executive Vice President and Chief Supply Chain Officer for or on behalf of Vantive US Healthcare LLC through July 24, 2027." (Add. 20). It reasoned that Much "will have some responsibility for . . . demand planning and logistics" at Vantive that "resemble those he had at Fresenius," but also recognized that Much's role at Vantive includes "additional duties relating to Vantive's procurement and manufacturing or his work

in other regions" that are beyond the role he held at Fresenius Manufacturing (J.A. Vol. II 572-73).

This Order bars a job title, not specific conduct. That distinction matters. Much cannot know whether performing procurement and manufacturing duties—which he never performed at Fresenius Manufacturing—would violate the Order, or whether only particular demand-planning and logistics duties are prohibited. *Union Home Mortgage Corp.*, 31 F.4th at 363 (internal quotations and citations omitted) (reversing and remanding preliminary injunction in noncompete case because it lacked precise descriptions of prohibited conduct that would violate restrictive covenants).

Much asked the district court to clarify the Order so he and Vantive could determine if Vantive could employ Much in an alternative role that merely eliminates the minimally overlapping demand planning duties. (*See* J.A. Vol. II 584-85). The district court declined (J.A. Vol. II 647), leaving Much and his new employer to guess at the line between lawful employment and contempt, even though the district court recognized that Much's procurement, manufacturing, and other responsibilities are beyond his former role. (Add. 15). This lack of clarity is effectively precluding Much from working for Vantive in any role, even though his PCA only precludes him from working in a role that is the "same" or "substantially similar" to his role at Fresenius Manufacturing. *See Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 389-90

(3rd Cir. 2021) (vague descriptions of "general categories of business and technical information" operated to preclude defendants from using publicly available information or general know-how).

### B. The Order Impermissibly Incorporated The PCA

The uncertainty of the Order of Injunction was exacerbated by the additional catchall prohibition barring Much from "[v]iolating the terms of the [PCAs]." Here too, the district court incorporates a disputed contract by reference without explaining what conduct is restrained or would constitute a breach. Instead, it impermissibly leaves the parties to determine for themselves which duties, information, and business relationships trigger contempt. Ultimately, this injunction fails to provide Much with minimum due process. Those enjoined cannot be "left to guess at what they are forbidden to do." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 75 (1967).

### C. The Order Enjoined Conduct Without Finding a Violation

The Order of Injunction is also overbroad because Paragraphs 2 and 3 of the Order enjoined Much from using Fresenius Manufacturing's confidential information and trade secrets as defined in the PCAs, and then further ordered Much to itemize and return all confidential information in his possession. (Add. 20).[7]

[7] The incorporation of the PCA definition of confidential information was also improper as noted in Section IV(B) *supra*.

The district court failed to provide any reasoning for this relief. These aspects of the injunction's overreach are clear from the undisputed record:

- The district court expressly declined to "address the merits of the motion regarding Fresenius's MTSA and DTSA claims." (Add 15 n.2).
- There is not a single factual allegation to support the baseless accusations in Paragraphs 66, 68, 69, 80, 82, and 83 of the complaint that Much has taken or used Plaintiff's trade secrets for Vantive's benefit. (J.A. Vol. I 13, 26-27).
- The unrebutted evidence is Much's testimony that after resigning, he returned his work computer and iPad, and Fresenius Manufacturing then remotely wiped its applications and data from his personal phone. (J.A. Vol. II 445 (Much Decl. ¶ 68)).[8]

The inclusion of this relief is prohibited where, as here, there is zero basis in the record for such an order. *See Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (vacating preliminary injunction where the district

[8] After Appellee failed to respond to his inquiries about removing company information from his personal devices, Much then retained CRA to image and preserve the accounts so there would be a record of any information that he may have in his possession. (J.A. Vol. II 445-46 (Much Decl. ¶ 70)). Then CRA and Much searched for and deleted the Fresenius Manufacturing information in his possession before Much's start date at Vantive. (*Id.*; J.A. Vol. II 470-72 (Roffman Decl. ¶¶ 5-9)).

court "fail[ed] to detail what the conduct is, *i.e.*, the substance of the 'trade secret' or 'confidential information'" and the parties "dispute[d] what information is protected").

Perhaps the district court felt there was no harm in simply adding relief it felt consistent with Much's contractual requirement. But that isn't enough. In absence of any breach, the district court has no authority to award relief. *Id.*

## **CONCLUSION**

For these reasons, Appellant urges this Court to reverse the district court's order granting a preliminary injunction and to vacate that preliminary injunction entered on September 10, 2026. There are four separate flaws in that injunction; any one of those alone justifies reversal.

Dated: October 2, 2026

Respectfully submitted,

*/s/ Steven J. Torres*

STEVEN J. TORRES [#1162938]
JONATHAN M. SHINE [#1135879]
Torres Scammon Hincks & Day
119 High Street
Boston, MA 02110
(617) 206-4895
storres@tshdlegal.com
jshine@tshdlegal.com

RACHEL COWEN [#1198975]
Dechert LLP
444 W. Lake Street, Suite 2100
Chicago, IL 60606
(312) 646-5825
Rachel.Cowen@dechert.com

*Counsel for Defendant-Appellant Micah Much*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the Appellant's Opening Brief:

(i) Complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,113 words, excluding the parts of the motion exempted by Rule 32(f); and

(ii) Complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word and is set in Times New Roman font in a size equivalent to 14 points or larger.

*/s/ Steven J. Torres*
Steven J. Torres

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2026, I had electronically filed the Appellant's Opening Brief filed using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system. Additionally, I certify that an unredacted copy was also provided to counsel for all parties by electronic mail.

*/s/ Steven J. Torres*
Steven J. Torres

**ADDENDUM (LR 28)**

Memorandum and Order Issuing Preliminary Injunction………………..ADD 002

Order of Preliminary Injunction……………………………………….ADD 020

G.L. ch. 149 § 24L…………………………………………………….ADD 022

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **FRESENIUS USA MANUFACTURING, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MICAH MUCH,**<br><br>**Defendant.** | ) | **Case No. 26-cv-13572-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **August 31, 2026**

## I. Introduction

This matter comes before the Court on a motion for a temporary restraining order ("TRO") and preliminary injunction of Plaintiff, Fresenius USA Manufacturing, Inc. ("Fresenius"), a subsidiary of Fresenius Medical Care Holdings, Inc. ("FME"). D. 3. Pursuant to Federal Rule of Civil Procedure 65, Fresenius seeks to enjoin its former employee, Defendant Micah Much ("Much") by enforcing the provisions of its Employee Confidentiality, Assignment and Protective Covenants Agreements ("Agreements") with Much. Id.; D. 5 at 2. For the reasons stated below, the Court ALLOWS Fresenius's motion, D. 3.

Fresenius filed its complaint on August 5, 2026, D. 1, and sought preliminary relief that same day, D. 3. Fresenius seeks preliminary relief due to Much's recent employment with its direct competitor, Vantive US Healthcare LLC ("Vantive"), D. 5 at 2. In his opposition, D. 41,

Much argues that the Agreements' noncompetition provisions are unenforceable under the Massachusetts Noncompetition Agreement Act ("MNAA"), Mass. Gen. L. c. 149, § 24L(b), that Fresenius's substantive claims fail as a matter of law and that Fresenius cannot establish irreparable harm, id. at 6-7. The Court heard arguments from the parties and took the pending motion under advisement. D. 50.

## II. Standard of Review

"[A]llowance of a TRO, as with a preliminary injunction, is an extraordinary and drastic remedy that is never awarded as of right." Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 592 F. Supp. 3d 1, 3 (D. Mass. 2022) (internal citation and quotation marks omitted). To obtain any form of preliminary injunctive relief, a plaintiff "must demonstrate: 1) a substantial likelihood of success on the merits, 2) a significant risk of irreparable harm if the injunction is withheld, 3) a favorable balance of hardships, and 4) a fit (or lack of friction) between the injunction and the public interest." Chiang v. Skeirik, 529 F. Supp. 2d 166, 172 (D. Mass. 2007) (citing Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)); see NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020). The likelihood of success on the merits is the "critical" factor in the analysis. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

## III. Factual Background

In deciding a motion for a preliminary injunction, "the Court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits." D.V.D. v. U.S. Dep't of Homeland Sec., 778 F. Supp. 3d 355, 386-87 (D. Mass. 2025) (internal citation and quotation marks omitted).

**A. FME and Fresenius**

FME and its global affiliates provide products and services to people with chronic kidney failure, D. 1 ¶ 6, and distribute "a comprehensive range of medical devices, related supplies and renal pharmaceuticals" to dialysis patients, id. ¶ 8. Millions of individuals with chronic kidney failure regularly undergo dialysis treatment, which is a blood cleansing procedure that substitutes for the function of the kidney in the case of kidney failure. Id. ¶ 6. Among the types of treatments FME provides, peritoneal dialysis ("PD") can be performed in a patient's home daily, id. ¶ 7, which necessitates a unique system of manufacturing, storage and delivery, see D. 10 ¶ 11; D. 11 ¶ 10.

Care Enablement is an "organizational division" within FME that "centralizes its healthcare products business, including research and development, manufacturing, supply chain and commercial operations as well as supporting functions, such as regulatory and quality management." D. 1 ¶ 9. Vantive is Care Enablement's primary and direct competitor in the PD business for in-home patients. Id. ¶ 10; D. 11 ¶ 9; D. 12 ¶ 14.

Much describes Care Enablement as one of FME's three separate business divisions, D. 42 ¶ 17, that is responsible for manufacturing and distributing products used by Fresenius's customers, id. ¶ 20. He further describes his role as "within the Care Enablement division at Fresenius Manufacturing." Id. ¶ 24.

**B. Much's Role and Responsibilities at Fresenius**

Fresenius hired Much on September 30, 2022, as its "Vice President North America Supply Chain," and later updated Much's job title to "Vice President Supply Chain Americas" on January 5, 2025. D. 9 ¶ 14. He used an email address with the domain name

"@freseniusmedicalcare.com" and referred to himself as the "Vice President, Supply Chain Americas Care Enablement (CE), Fresenius Medical Care." D. 11-3 at 4. Much had no prior experience in the kidney care or healthcare industry before joining Fresenius, D. 9 ¶ 15, but had thirty years of supply chain leadership experience in the aerospace and defense industries, D. 42 ¶ 2. Much was a highly compensated executive at Fresenius. See D. 9 ¶¶ 17-18.

As Vice President Supply Chain Americas, Much was responsible for "the overall supply chain management for Care Enablement." D. 10 ¶ 10. He "managed the supply chain budget and oversaw the processing and delivery of products to more than 30,000 clinics, hospitals and home patients." Id. Much describes the concept of a "supply chain" as encompassing the "entire cycle" of a business from procurement, to manufacturing and demand and supply logistics, which further entails inventory management and the transportation of goods to the end customer. D. 42 ¶ 5. Due to the nature of Much's role, the FME business model and supply chain dynamics, Much interacted with the corporate departments within FME as well as outside suppliers and consultants. D. 10 ¶ 12. In essence, Much was responsible for ensuring Care Enablement's products were available to customers, stocked and delivered in a timely manner throughout the Americas. Id.

Fresenius provides several examples of confidential information Much had access to by virtue of his role and through discussions, projects and meetings with other FME executives. For one example, on May 21, 2026, Much spoke at an Executive Manufacturing Supply Chain Project Review meeting about two projects he was leading. Id. ¶ 18. Both projects were confidential and involved strategies to change delivery methods and control costs for future "enterprise transformations," id., and other projects not known to the public involving future FME products were discussed at the same meeting, id. ¶ 20.

Much was also "an integral participant and leader" of the executive meetings for sales, inventory and operations planning ("SIOP") that met monthly to discuss FME's overall supply chain network and costs. Id. ¶ 22. Much describes SIOP as "a cross-functional business process that brings together personnel from commercial, finance, procurement, manufacturing, and logistics to determine how the organization will satisfy its product demand." D. 42 ¶ 11. Much presented an "Americas Supply Chain Operational Assessment" slide show at the June 2026 SIOP meeting before various leaders across FME where he addressed "[e]xecutive focus on decisions needed and top risks reviewed." D. 10-1; D. 10-2; D. 10 ¶ 23.

Fresenius also emphasizes the role Much played in the "PD Turnaround Project," which it describes as "a high-level corporate priority project . . . with the express purpose of focusing on FME's peritoneal dialysis (PD) business for in-home patients . . . for which Vantive is one of FME's biggest competitors." D. 11 ¶ 9. Much and leaders from other FME divisions met quarterly to discuss the PD Turnaround Project and addressed strategies related to supply chain, manufacturing and commercial sales issues including future products, launch strategies, market and growth analyses, vendor relationships and FME's strengths and weaknesses in the PD business. Id. ¶ 10. The June 2026 PD Turnaround Project meeting specifically discussed "strategies about competing with Vantive such as with respect to pricing, costs, market share and product analyses." Id. ¶ 16.

Lastly, Much engaged with FME customers and vendors on behalf of Fresenius. For example, in April 2026, Much participated in a tour of a FME distribution center in Dallas, Texas with FME's customer, DaVita Kidney Care. Id. ¶ 19. Later that month, Much planned and led a larger tour for DaVita executives through another FME distribution center in Aurora, Colorado.

Id. ¶ 20.

C. **The Agreements**

In connection with FME's long-term incentive plan, Much executed a series of substantially identical Agreements dated November 28, 2022, August 1, 2023, July 25, 2024 and July 28, 2025, respectively. D. 1 ¶ 28; D. 9 ¶ 19; D. 41 at 12 n.1. For executing the Agreements, Much received a payout of $82,778 and incentive grants of $110,000, $118,000 and $115,000, respectively. D. 9 ¶ 22.

Each agreement states that it does not supersede prior restrictive covenants between the parties addressing "post-employment obligations, such as agreements concerning nondisclosure of Confidential Information or Trade Secrets, nonsolicitation, noncompetition and intellectual property." D. 1 ¶ 30; D. 1-2 at 11 § 10. The Agreements include several provisions relevant here, including that Much would not use or disclose any confidential information and that he would return all of FME's property (including electronic information) upon termination of his employment. D. 1 ¶ 31; D. 1-2 at 2-3 § 3. Furthermore, the Agreements prohibit Much for twelve months following the termination of his employment from working for or in furtherance of any "Competing Business" within the "Restricted Area" under circumstances where his "duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities" performed for Fresenius during the look back period. D. 1 ¶ 32; D. 1-2 at 7 § 5(b).

D. **Much's Resignation and Move to Vantive**

Much started interviewing with Vantive in or about May 2026. D. 42 ¶¶ 59, 61. On June 10, 2026, Much returned his Fresenius-issued cell phone and informed the company that he would

be using his personal phone for business thereafter. D. 1 ¶ 36; D. 42 ¶ 67. On June 15, 2026, Much received a verbal job offer from Vantive, and he negotiated the terms of that offer before receiving a formal written job offer on July 14, 2026. D. 42 ¶ 63. Much continued to work at Fresenius and submitted his formal resignation notice on July 16, 2026, days after receiving his second retention bonus of $70,000. D. 1 ¶ 38; D. 42 ¶ 64. In connection with his resignation, Much informed Fresenius that he had accepted an executive-level position with Vantive and would be responsible for overseeing Vantive's global logistics and supply chain operations, among other duties. D. 1 ¶ 40; D. 42 ¶ 64. Much originally submitted an end date of July 30, 2026, but later left on July 24, 2026, D. 1 ¶ 39; D. 42 ¶ 66.

Much started at Vantive on July 28, 2026, as its Executive Vice President and Chief Supply Chain Officer. D. 42 ¶ 72. He is a member of Vantive's senior executive leadership team and he reports directly to Vantive's CEO. Id.

## IV. Discussion

Fresenius alleges that Much has breached the Agreements by providing services, or planning to provide services, to Vantive in his new role, D. 1 ¶¶ 53-59; that Much has violated the Massachusetts Trade Secrets Act ("MTSA"), Mass. Gen. L. c. 93, §§ 42, 42A-42G, D. 1 ¶¶ 60-72, and that Much has violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, D. 1 ¶¶ 73-86.

### A. **The Agreements are Valid and Enforceable under the MNAA**

The Agreements contain a Massachusetts choice of law provision, D. 1-1 at 9 § 7, and the parties do not dispute that Massachusetts law governs their contract dispute. The MNAA "governs the enforceability of noncompetition agreements, like [Much's], entered into on or after

October 1, 2018." DraftKings Inc. v. Hermalyn, 732 F. Supp. 3d 84, 109 (D. Mass. 2024) (citing Automile Holdings, LLC v. McGovern, 483 Mass. 797, 807 n.15 (2020)), aff'd, 118 F.4th 416 (1st Cir. 2024). A "valid and enforceable" agreement:

> (i) must be in writing, be signed by employer and employee, and state that the employee has the right to consult with counsel before signing; (ii) must be supported by fair and reasonable consideration independent from the continuation of employment if signed after commencement of employment, and provide the employee with ten business days' notice before becoming effective; (iii) must be no broader than necessary to protect the employer's trade secrets, confidential information, or goodwill, each of which constitute legitimate business interests; (iv) may not exceed twelve months from the last day of employment, unless the employee has breached a fiduciary duty or unlawfully taken property belonging to the employer, in which case the agreement may not exceed two years from the last day of employment; (v) must be reasonable in geographic reach in relation to the interests protected; (vi) must be reasonable in the scope of proscribed activities in relation to the interests protected; (vii) must be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee; and (viii) must be consonant with public policy.

Id. (internal quotation marks omitted) (quoting Mass. Gen. L. c. 149, §§ 24L(b)(i)-(viii)). Much contends, as a threshold issue, that the Agreements Fresenius seeks to enforce do not comply with the first and third MNAA criteria. D. 41 at 14-17.[1]

For the first criteria, Much does not dispute that the Agreements are in writing, signed by him and inform him of his right to consult with counsel. See D. 41 at 14-17; D. 1-1 at 10-11. Much, however, argues that the Agreements are unenforceable because the name of his specific

[1] Much contends in a single sentence of his opposition that Fresenius's requested injunction "is a wild overreach that goes beyond what their own agreement permits and is expressly prohibited by the MNAA." D. 41 at 17. To the extent that Much is referring to the geographic scope of the Agreements and suggesting that it violates the MNAA, the Court concludes that the Agreements define the "Restricted Area" as the geographic areas where FME conducts business and where Much "provided services or had a material presence or influence," D. 1-1 at 6 § 5(a)(vi), which complies with the MNAA's requirement that a noncompetition agreement "be reasonable in geographic reach in relation to the interests protected," Mass. Gen. L. c. 149, § 24L(b)(v); see DraftKings, 732 F. Supp. 3d at 110 (applying this provision of the MNAA).

"employer," Fresenius USA Manufacturing, does not appear in the Agreements and Fresenius did not sign the Agreements. D. 41 at 14-17; see D. 1 ¶¶ 12, 53; Mass. Gen. L. c. 149, § 24L(b)(i). Fresenius disputes this characterization because the Agreements refer to Much's "Employer" which both parties recognize was Fresenius. D. 47 at 7.

The Agreements are signed by two individuals "[o]n behalf of the Employer" — Brian Silva, "Head, Global Human Resources," signed the first three Agreements, D. 1-1 at 11; D. 1-2 at 12; D. 1-3 at 12, and Michael Dunleavy, Jr., "SVP Global Total Rewards," signed the fourth Agreement, D. 1-4 at 13. Each Agreement defines "the Employer" in its first paragraph as "a subsidiary of Fresenius Medical Care Holdings, Inc." that employed Much at the time of execution. D. 1-4 at 2. Furthermore, each Agreement provides prior to its substantive provisions that "[b]y signing below, the Employer and [Much] expressly agree, as follows." Id.

Only one specific subsidiary of FME employed Much, Fresenius USA Manufacturing. D. 42 ¶ 16. In its Rule 7.1 corporate disclosure statement, Fresenius (specifically, Plaintiff Fresenius USA Manufacturing, Inc.) states that it is "an indirect subsidiary of Fresenius Medical Care Holdings, Inc." which itself is "an indirect, wholly owned subsidiary of its ultimate parent company Fresenius Medica Care AG." D. 2 at 1. The Agreements' reference to "a subsidiary of Fresenius Medical Care Holdings, Inc." that employed Much, D. 1-4 at 2, sufficiently implicates his specific employer rather than the broader FME parent company. Cf. Moura v. Cannon, No. 17-cv-40166-TSH, 2021 WL 4422964, at *9 (D. Mass. Sept. 27, 2021) (concluding an alternate employer was liable for workers' compensation based on the parties' relationship even though the alternate employer was "not specifically named" in the written agreement). Likewise, both Silva and Dunleavy signed the Agreements "[o]n behalf of the Employer," and had authorization to

execute the Agreements on behalf of Fresenius. D. 49 ¶¶ 6-7; see Dolben v. Gleason, 292 Mass. 511, 514 (1935) (stating that "[a] contract made by the authorized agent of a corporation is the corporation's contract").

Much cites Anaplan Parent, LP v. Brennan, No. 2584-cv-02350 (Mass. Super. Ct. Sept. 15, 2025), appeal docketed, No. SJC-13917, as persuasive support that the Agreements must be signed by Fresenius specifically. D. 41 at 16. That case differs from the alleged facts here since the former employee there entered into an equity grant agreement including a noncompetition provision directly with the parent company and not with the defendant's employer. Thus, the Superior Court's reasoning for concluding that the agreement was unenforceable under the MNAA, see Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 9 (focusing on the "general and well-established doctrine of corporate separateness") is inapposite here, where, by the very terms of the Agreements, Much entered the Agreements with his employer. D. 1-4 at 2; see Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 10 (noting that the "signature requirement plainly seeks to ensure that there is concrete evidence that employer and employee entered into a binding non-compete agreement and thereby assumed reciprocal obligations under the statute").

As for the third criteria — that the contract be "no broader than necessary to protect" specific "legitimate business interests of the employer," Mass. Gen. L. c. 149, § 24L(b)(iii) — Much contends that the Agreements' inclusion of confidential information and trade secrets belonging to "the Company" and preclusion of employment by competitors of "the Company" goes beyond protecting Fresenius's legitimate business interests. D. 41 at 14-17. Fresenius argues the Agreements are no broader than necessary to protect FME's interests, D. 5 at 13, which it defines as including "Plaintiff Fresenius USA Manufacturing, Inc., and its parent

company Fresenius Medical Care Holdings, Inc. and any related affiliate," id. at 2 n.2. Fresenius further argues that the specific facts of this case and the Agreements demonstrate that the noncompetition restrictions are tailored in scope to Much's duties and responsibilities with Fresenius, which is permissible under the MNAA. D. 47 at 8.

The MNAA requires noncompetition agreements to be "no broader than necessary to protect" specific "legitimate business interests of the employer," which include the employer's trade secrets, confidential information and goodwill, see Mass. Gen. L. c. 149, § 24L(b)(iii), and it does not define "employer." Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 5. The Court, however, disagrees with Much's contention that the MNAA's reference to protecting the "legitimate business interest of the employer" makes the Agreements between him and Fresenius unenforceable.

The reasonableness of a noncompetition agreement's scope must be assessed "in light of the facts in each case." DraftKings Inc., 732 F. Supp. 3d at 110 (internal citation and quotation marks omitted). Here, the noncompetition provisions of the Agreements restrict Much from working "in circumstances where [his] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities [he] performed for the Company." D. 1-1 at 7 § 5(b). While the scope of the noncompetition provisions reference the broader FME entity, id. 2 §1, it is nevertheless limited to the duties and responsibilities Much actually performed. On this basis, Much's Agreements differ from those deemed unenforceable by the Delaware courts in the cases he cites. D. 41 at 16. Specifically, the Court of Chancery of Delaware concluded that a noncompetition agreement "including the employer's affiliates is not tailored to the employer's role while employed, and the inclusion of affiliates in different sectors and different

countries is not essential to the protection of the employer's legitimate business functions." Fortiline, Inc. v. McCall, No. 2024-0211-MTZ, 2024 WL 4088629, at *4 (Del. Ch. Sept. 5, 2024) (internal quotation marks and citation omitted); Kodiak Bldg. Partners, LLC v. Adams, No. 2022-0311-MTZ, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022) (holding an agreement unenforceable for extending to "other segments of Kodiak's business" where the former employee did not work and could not access confidential information). Much's Agreements, by contrast, focus on his role and duties while employed by Fresenius, thereby protecting the business interests of his former employer.

By restricting the noncompetition provision to Much's duties and responsibilities, the Agreements are not broader than necessary to capture Much's role within the FME ecosystem. See DraftKings, 732 F. Supp. 3d at 109-10 (comparing the scope of the noncompetition agreement to the employee's role). Much interacted with all corporate divisions within Care Enablement, "was privy to confidential information and trade secrets of the entire FME organization," D. 11 ¶ 6; D. 10 ¶ 15, and described his role as "a referee between the commercial, finance, and manufacturing teams, facilitating consensus regarding production, inventory, and deployment decisions," D. 42 ¶ 35. The Agreements are tailored to Much's role at Fresenius and, therefore, are not broader than necessary to protect the legitimate business interests that Much was privy to, see DraftKings, 732 F. Supp. 3d at 109-110; see also Cigna Corp. v. Bricker, 103 F.4th 1336, 1344 (8th Cir. 2024) (affirming preliminary injunction enforcing a noncompetition agreement where the employee was the president of a major subsidiary of the parent corporation, Cigna, and privy to protected information "touching all aspects of Cigna's business").

Accordingly, the Court concludes that the Agreements are valid and enforceable under the

MNAA.

**B. Fresenius Has Shown a Likelihood of Success that Much Breached the Agreements**

Fresenius must demonstrate a likelihood of success as to whether Much breached the Agreements by working at Vantive. Much claims that he has not breached the Agreements because his "responsibilities at Vantive are materially different from his prior role at Fresenius Manufacturing." D. 41 at 18. Fresenius contends that there is no dispute Much's duties and responsibilities at Vantive would at least overlap with those he had at Fresenius, which is all that is required to conclude he has breached the Agreements. D. 47 at 3.

The language of the Agreements bars Much from "work[ing] for or in furtherance of any Competing Business within the Restricted Area in circumstances where [Much's] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities" he performed for FME. D. 1-1 at 7 § 5(b). Much acknowledges that he "will have some responsibility for logistics functions at Vantive," but says that he will be focusing on "driving continuity, strategy, and excellence across Vantive's supply chain functions including demand planning and logistics." D. 41 at 18. These duties and responsibilities resemble those he had at Fresenius. D. 10 ¶ 10; D. 42 ¶ 27. Much's work for Vantive, while more expansive, is substantially similar to at least some of the duties and responsibilities he had with Fresenius in the past two years. See Cynosure LLC v. Reveal Lasers LLC, No. 22-cv-11176-PBS, 2022 WL 18033055, at *10 (D. Mass. Nov. 9, 2022) (concluding that a former employer had demonstrated a likelihood of success in proving that employees would be providing services to a competitor that violated the agreement, despite being "not exactly the same" services). The Agreements prohibit Much from performing "any of the duties and responsibilities" he performed for Fresenius in the

Americas, therefore, his additional duties relating to Vantive's procurement and manufacturing or his work in other regions of the world do not rebut the showing of a likelihood of success on the claim by Fresenius that his conduct breaches the Agreements. See Nat'l Med. Care, Inc. v. Sharif, No. 20-cv-11460-MBB, 2020 WL 6318922, at *7, 14 (D. Mass. Sept. 2, 2020) (concluding a defendant's new position included a "broader range of duties" but nevertheless breached the noncompetition agreement for also including substantially similar duties).

As Fresenius's declarations reflect, D. 11 ¶ 16; D. 10 ¶¶ 28-29, and Much's declaration from Vantive Chief Transformation Officer, James Prutow, acknowledges, D. 43 ¶¶ 6-7,17, Vantive is a direct competitor of FME in areas that Much has knowledge of FME's confidential information and strategies, see D. 48 ¶ 6; Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 129 (D. Mass. 2011). In short, Fresenius has shown it reasonably likely that Much, in going from Vice President, Supply Chain for the Americas at Fresenius to Executive Vice President and Chief Supply Chain Officer at Vantive, will engage in some of the same or substantially similar duties in violation of the Agreements.[2]

### C. Fresenius Would Suffer Irreparable Harm Absent Injunctive Relief

"Irreparable harm is 'an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'" Nat'l Med. Care, 2020 WL 6318922, at *14 (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005)). "A finding of irreparable harm is . . . triggered where the defendant has likely violated his noncompetition agreement."

[2] In light of the Court's conclusion that Fresenius has shown a likelihood of success on its breach of contract claim, the Court does not address the merits of the motion regarding Fresenius's MTSA and DTSA claims. See Nat'l Med. Care, 2020 WL 6318922, at *16 n.19.

DraftKings, 732 F. Supp. 3d at 120 (collecting cases). Moreover, Much stipulated in the Agreements that "any breach of this Agreement will cause the Company substantial and irreparable damage," D. 1-1 at 9 § 6, further supporting the existence thereof, see DraftKings, 732 F. Supp. 3d at 120 (relying on a similar acknowledgement in the employee's noncompetition agreement).

The present record demonstrates that Much had an extensive role overseeing FME's supply chain logistics and strategies in the Americas. In the months leading up to his resignation, Much led and attended several executive meetings discussing FME's plans for improving its supply chain in the Americas and at least one meeting discussing Fresenius's strategies about competing with Vantive in the PD business. D. 10 ¶ 23; D. 11 ¶¶ 9-10, 16. Vantive hired Much to "driv[e] continuity, strategy, and excellence across Vantive's fulfillment/logistics functions." D. 43 ¶ 11. It follows that Much will use his knowledge of FME's supply chain and strategies to the benefit of his former employer's direct competitor. See CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 59 (1st Cir. 2020) (stating that it "strains credulity to think that a top-echelon executive . . . could develop a strategy for [a competitor] without dipping into" his extensive knowledge of his former employer's strategic initiatives and business relations).

Much contends that Fresenius cannot demonstrate irreparable harm because it knew that he was considering a role with Vantive in May 2026 yet left him in his role at Fresenius without restriction until he resigned. D. 41 at 24-25. Even putting aside any evidence that Care Enablement CEO, Joseph Turk, asked Much to stop pursuing any position with Vantive in May 2026, D. 42 ¶ 59; D. 48 ¶¶ 3-4, Much did not inform Fresenius that he accepted a role with Vantive until July 16, 2026 and the company withdrew his access to Fresenius's systems the same day. D. 42 ¶¶ 64-66. Much left Fresenius a week later, on Friday, July 24, 2026, id. ¶ 66, and the

following Monday counsel for Fresenius sent Much a letter reminding him of his obligations under the Agreements as they related to his employment with Vantive, D. 8 ¶ 2; D. 8-1. Fresenius sued and filed its motion for injunctive relief the following week. D. 1; D. 3. This timeline of events does not undermine Fresenius's claim of irreparable harm. Cf. Channing Bete Co. v. Greenberg, No. 19-cv-30032-MGM, 2021 WL 4691597, at *7 (D. Mass. July 21, 2021) (concluding plaintiffs delay of "at least a year . . . substantially undermines its assertion that it needs immediate relief").

Because Fresenius has shown a likelihood of success on the merits of its claim that Much violated the Agreements through his present employment with Vantive, Fresenius has shown that it would suffer irreparable harm absent injunctive relief. See DraftKings, 732 F. Supp. 3d at 120.

### D. The Balance of Harms Favors Injunctive Relief

"Balancing the harms involves examining 'the hardship to the nonmovant if enjoined as contrasted with the hardship to the nonmovant if no injunction issues.'" Nat'l Med. Care, 2020 WL 6318922, at *15 (quoting Black Tea Soc'y v. City of Bos., 378 F.3d 8, 11 (1st Cir. 2004)). Noncompetition agreements, by their nature, "impose some burden on former employees," but "that fact alone does not make such covenants unenforceable." Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 442 (D. Mass. 2010) (internal quotation marks and citation omitted).

Much voluntarily and knowingly entered into the Agreements and received the benefits conferred therein. See D. 9 ¶ 22. He retains the ability to work for companies that do not compete with his former employer, including those in his prior industries. See Cynosure LLC, 2022 WL 18033055, at *15. Further, Much stipulated in the Agreements that they "do not impose an unreasonable burden upon me or the public." D. 1-1 at 5 § 5. As discussed previously,

Fresenius will likely experience irreparable harm should Much remain in his new role with Vantive. Accordingly, the harm to Fresenius outweighs the harm to Much. See Nat'l Med. Care, 2020 WL 6318922, at *15 (reaching the same conclusion regarding a former FME employee).

**E. Public Interest Does Not Preclude Injunctive Relief**

While the public interest favors affording individuals the ability to engage freely in their chosen profession, see Automile Holdings, 483 Mass. at 808, the public interest is also served by enforcing contractual obligations, including noncompetition agreements between consenting parties. Nat'l Med. Care, 2020 WL 6318922, at *16. "On balance, the public interest does not preclude allowing the preliminary injunction sought by plaintiff." Id.

## V. Conclusion

For the foregoing reasons, the Court ALLOWS Fresenius's motion for a preliminary injunction. D. 3. Accordingly, subject to the parties' filings regarding any bond as discussed below, the Court shall enter an Order of Injunction, pursuant to this Memorandum and Order and Fed. R. Civ. P. 65, that Much shall: 1) cease his current employment as Executive Vice President and Chief Supply Chain Officer at Vantive through July 24, 2027; 2) refrain from use of Confidential Information and Trade Secrets as defined in the Agreements; 3) identify and return all copies of Confidential Information and Trade Secrets as defined in the Agreements; and 4) comply with all terms of the Agreement. Fresenius has until to September 2, 2026 to file a memorandum, not to exceed five pages, providing a position about whether the Court should require a bond under Fed. R. Civ. P. 65(c) in allowing this relief. Much then has until September 4, 2026 to respond to same in a memorandum not exceeding five pages. There is nothing barring the parties from agreeing to a bond amount (or agreeing that no bond is warranted) and informing

the Court of same by September 2, 2026.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **FRESENIUS USA MANUFACTURING, INC.,** <br> **Plaintiff,** <br> **v.** <br> **MICAH MUCH,** <br> **Defendant.** | ) | **Case No. 26-cv-13572-DJC** |

**ORDER OF PRELIMINARY INJUNCTIVE RELIEF**

For the reasons stated by the Court in its Memorandum and Order, D. 51 (entered August 31, 2026), and having solicited and considered the parties' positions on the imposition of a bond, D. 52; D. 53; D. 55, and in accordance with Federal Rule of Civil Procedure 65, the Court hereby ALLOWS Plaintiff Fresenius USA Manufacturing, Inc.'s ("Fresenius's") motion for a preliminary injunction, D. 3, and ORDERS as follows:

Defendant Micah Much ("Much") is enjoined from:

1) Retaining his current employment as Executive Vice President and Chief Supply Chain Officer for or on behalf of Vantive US Healthcare LLC through July 24, 2027;
2) Using Fresenius's Confidential Information and Trade Secrets as defined in the Employee Confidentiality, Assignment and Protective Covenants Agreements ("Agreements"); and
3) Violating the terms of the Agreements.

IT IS FURTHER ORDERED that Much shall identify and return all copies of Confidential Information and Trade Secrets as defined in the Agreements.

IT IS FURTHER ORDERED that this Order shall remain in effect until further Order of this Court.

IT IS FURTHER ORDERED that, in accordance with Federal Rule of Civil Procedure 65(c), Fresenius shall pay a bond of $500,000 as security for this relief.

**So Ordered.**

Dated: September 10, 2026

/s Denise J. Casper
Chief United States District Judge

KeyCite Yellow Flag
Proposed Legislation

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 149. Labor and Industries (Refs & Annos)

M.G.L.A. 149 § 24L

# § 24L. Massachusetts Noncompetition Agreement Act

Effective: January 14, 2021
Currentness

(a) As used in this section, the following words shall have the following meanings:-

"Business entity", any person or group of persons performing or engaging in any activity, enterprise, profession or occupation for gain, benefit, advantage or livelihood, whether for profit or not for profit, including but not limited to corporations, limited liability companies, limited partnerships or limited liability partnerships.

"Employee", an individual who is considered an employee under section 148B of this chapter; provided, however, that the term "employee", as used in this section, shall also include independent contractors under section 148B.

"Forfeiture agreement", an agreement that imposes adverse financial consequences on a former employee as a result of the termination of an employment relationship, regardless of whether the employee engages in competitive activities following cessation of the employment relationship. Forfeiture agreements do not include forfeiture for competition agreements.

"Forfeiture for competition agreement", an agreement that by its terms or through the manner in which it is enforced imposes adverse financial consequences on a former employee as a result of the termination of an employment relationship if the employee engages in competitive activities.

"Garden leave clause", a provision within a noncompetition agreement by which an employer agrees to pay the employee during the restricted period, provided that such provision shall become effective upon termination of employment unless the restriction upon post-employment activities are waived by the employer or ineffective under subsection (c)(iii).

"Noncompetition agreement", an agreement between an employer and an employee, or otherwise arising out of an existing or anticipated employment relationship, under which the employee or expected employee agrees that he or she will not engage in certain specified activities competitive with his or her employer after the employment relationship has ended. Noncompetition agreements include forfeiture for competition agreements, but do not include: (i) covenants not to solicit or hire employees of the employer; (ii) covenants not to solicit or transact business with customers, clients, or vendors of the employer; (iii) noncompetition agreements made in connection with the sale of a business entity or substantially all of the operating assets of a business entity or partnership, or otherwise disposing of the ownership interest of a business entity or partnership, or division or subsidiary thereof, when the party restricted by the noncompetition agreement is a significant owner of, or member or partner in, the business entity who will receive significant consideration or benefit from the sale or disposal; (iv) noncompetition agreements outside of an employment relationship; (v) forfeiture agreements; (vi) nondisclosure or confidentiality agreements; (vii) invention assignment agreements; (viii) garden leave clauses; (ix) noncompetition agreements made in connection with the

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

cessation of or separation from employment if the employee is expressly given seven business days to rescind acceptance; or (x) agreements by which an employee agrees to not reapply for employment to the same employer after termination of the employee.

"Restricted period", the period of time after the date of cessation of employment during which an employee is restricted by a noncompetition agreement from engaging in activities competitive with his or her employer.

(b) To be valid and enforceable, a noncompetition agreement must meet the minimum requirements of paragraphs (i) through (viii).

(i) If the agreement is entered into in connection with the commencement of employment, it must be in writing and signed by both the employer and employee and expressly state that the employee has the right to consult with counsel prior to signing. The agreement must be provided to the employee by the earlier of a formal offer of employment or 10 business days before the commencement of the employee's employment.

(ii) If the agreement is entered into after commencement of employment but not in connection with the separation from employment, it must be supported by fair and reasonable consideration independent from the continuation of employment, and notice of the agreement must be provided at least 10 business days before the agreement is to be effective. Moreover, the agreement must be in writing and signed by both the employer and employee and expressly state that the employee has the right to consult with counsel prior to signing.

(iii) The agreement must be no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill. A noncompetition agreement may be presumed necessary where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant, including but not limited to a non-solicitation agreement or a non-disclosure or confidentiality agreement.

(iv) In no event may the stated restricted period exceed 12 months from the date of cessation of employment, unless the employee has breached his or her fiduciary duty to the employer or the employee has unlawfully taken, physically or electronically, property belonging to the employer, in which case the duration may not exceed 2 years from the date of cessation of employment.

(v) The agreement must be reasonable in geographic reach in relation to the interests protected. A geographic reach that is limited to only the geographic areas in which the employee, during any time within the last 2 years of employment, provided services or had a material presence or influence is presumptively reasonable.

(vi) The agreement must be reasonable in the scope of proscribed activities in relation to the interests protected. A restriction on activities that protects a legitimate business interest and is limited to only the specific types of services provided by the employee at any time during the last 2 years of employment is presumptively reasonable.

(vii) The noncompetition agreement shall be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee, provided that such consideration is specified in the noncompetition agreement. To constitute a garden leave clause within the meaning of this section, the agreement must (i) provide for the payment, consistent with the requirements for the payment of wages under section 148 of chapter 149 of the general laws, on a pro-rata basis during the entirety of the restricted period, of at least 50 percent of the employee's highest annualized base salary paid by the employer

within the 2 years preceding the employee's termination; and (ii) except in the event of a breach by the employee, not permit an employer to unilaterally discontinue or otherwise fail or refuse to make the payments; provided, however, if the restricted period has been increased beyond 12 months as a result of the employee's breach of a fiduciary duty to the employer or the employee has unlawfully taken, physically or electronically, property belonging to the employer, the employer shall not be required to provide payments to the employee during the extension of the restricted period.

(viii) The agreement must be consonant with public policy.

(c) A noncompetition agreement shall not be enforceable against the following types of workers: (i) an employee who is classified as nonexempt under the Fair Labor Standards Act, 29 U.S.C. 201-219; (ii) undergraduate or graduate students that partake in an internship or otherwise enter a short-term employment relationship with an employer, whether paid or unpaid, while enrolled in a full-time or part-time undergraduate or graduate educational institution; (iii) employees that have been terminated without cause or laid off; or (iv) employees age 18 or younger. This section does not render void or unenforceable the remainder of the contract or agreement containing the unenforceable noncompetition agreement, nor does it preclude the imposition of a noncompetition restriction by a court, whether through preliminary or permanent injunctive relief or otherwise, as a remedy for a breach of another agreement or a statutory or common law duty.

(d) A court may, in its discretion, reform or otherwise revise a noncompetition agreement so as to render it valid and enforceable to the extent necessary to protect the applicable legitimate business interests.

(e) No choice of law provision that would have the effect of avoiding the requirements of this section will be enforceable if the employee is, and has been for at least 30 days immediately preceding his or her cessation of employment, a resident of or employed in Massachusetts at the time of his or her termination of employment.

(f) All civil actions relating to employee noncompetition agreements subject to this section shall be brought in the county where the employee resides or, if mutually agreed upon by the employer and employee, in Suffolk county; provided that, in any such action brought in Suffolk county, the superior court or the business litigation session of the superior court shall have exclusive jurisdiction.

**Credits**

Added by St.2018, c. 228, § 21, eff. Aug. 10, 2018. Amended by St.2018, c. 260, § 1, eff. Oct. 5, 2018; St.2020, c. 358, § 76, eff. Jan. 14, 2021.

Notes of Decisions (5)

M.G.L.A. 149 § 24L, MA ST 149 § 24L
Current through Chapter 101 of the 2026 2nd Annual Session. Some sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.