UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

NO. 26-2052

---

**FRESENIUS USA MANUFACTURING, INC.**
**Plaintiff – Appellee,**

**v.**

**MICAH MUCH**
**Defendant – Appellant.**

---

On Appeal from a Preliminary Injunction
of the United States District Court for the District of Massachusetts
in Case No. 26-cv-13572-DJC, The Honorable Denise J. Casper

---

# Brief of Plaintiff-Appellee

---

Jeffrey S. Siegel
Court of Appeals Bar No. 87845
Sean P. O'Connor
Court of Appeals Bar No. 1137121
Robert Papandrea
Court of Appeals Bar No. 1216847
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109-2605
(617) 523-6666
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: November 2, 2026

Attorneys for Plaintiff-Appellee

## CORPORATE DISCLOSURE STATEMENT

Fresenius USA Manufacturing, Inc. is an indirect subsidiary of Fresenius Medical Care Holdings, Inc. Fresenius Medical Care Holdings, Inc. is an indirect, wholly owned subsidiary of its ultimate parent company Fresenius Medical Care AG. Fresenius Medical Care AG is a German stock corporation whose stock is publicly traded on the Frankfurt Stock Exchange under the ticker symbol "FME" and whose American Depository Receipts are traded on the New York Stock Exchange under the ticker symbol "FMS." Fresenius Medical Care AG indirectly owns 10% or more of the stock of Fresenius USA Manufacturing, Inc.

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................... iv

ISSUES PRESENTED ........................................................................... 1

PRELIMINARY STATEMENT .................................................................. 2

STATEMENT OF THE CASE .................................................................. 5

I. Statement of Facts Relevant to the Appeal ............................................ 5

A. Care Enablement and Vantive Are Competitors ...................................... 5

B. Much Was a Highly Paid Executive at FUSA and Agreed to Post-Employment Restrictive Covenants in Exchange for Long-Term Incentive Awards ........................................................................ 6

C. Much's Knowledge of and Access to Confidential Information and Trade Secrets ........................................................................ 8

D. Much Continues to Gather Strategies While Defecting from FUSA to Accept Employment at Vantive ................................................ 15

E. Much Breaches His Agreements ........................................................ 15

II. Course of Proceedings ........................................................................ 17

A. The Motion ........................................................................ 17

B. The District Court Grants FUSA's Motion ............................................ 19

SUMMARY OF THE ARGUMENT ........................................................... 25

STANDARDS OF REVIEW ................................................................... 27

ARGUMENT ........................................................................ 29

I. The District Court Properly Concluded that the Agreements Comply with the MNAA ........................................................................ 29

A. The District Court Properly Found that the Noncompetition Restrictions Protect FUSA's Legitimate Business Interests ....................................29

B. The District Court Found the Noncompete Necessary Without Having to Treat an Analysis of a Lesser Covenant as a Statutory Prerequisite .32

C. *Anaplan Parent* Does Not Require a Different Result ..........................35

II. The District Court Did Not Commit a Clear Abuse of Discretion By Ruling Without An Evidentiary Hearing and Properly Found A Reasonable Likelihood of Success of Breach of the Agreements.................................38

A. Much Waived Any Claim to An Evidentiary Hearing ..........................38

B. The District Court Did Not Commit a Clear Abuse of Discretion By Ruling on the Papers ..........................................................................40

C. The District Court Made Reasonable Inferences from the Record Evidence...........................................................................................42

D. The Record Evidence Supports the Order ............................................49

III. The Order and P.I. Satisfy Rule 65(d) ........................................................51

A. Much Failed to Formally Raise His Concern to the District Court and Waived the Argument on Appeal ........................................................51

B. The Order and P.I. Are Not Vague and Much's Litigation Strategy Does Not Entitle Him to Vacate the Order...........................................52

C. The Order and P.I. Set Out Much's Regulated Conduct .......................55

D. The Requirement to Identify and Return Confidential Information and Trade Secrets Is Supported by the Record....................................56

CONCLUSION ................................................................................................58

CERTIFICATE OF COMPLIANCE..................................................................60

CERTIFICATE OF SERVICE ..........................................................................60

# TABLE OF AUTHORITIES

## CASES

*Anaplan Parent, LP v. Brennan*, No. 2584CV02350 (Mass. Super. Ct. Sept. 11, 2025) ................................ *passim*

*Anderson v. Bessemer City*, 470 U.S. 564 (1985)................................28

*Aoude v. Mobil Oil Corp.*, 862 F.2d 890 (1st Cir. 1988)................................40, 43

*Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118 (D. Mass. 2011) ................31

*Axia NetMedia Corp. v. Massachusetts Tech. Park Corp.*, 889 F.3d 1 (1st Cir. 2018) ................................52, 54, 55

*Boulanger v. Dunkin' Donuts, Inc.*, 815 N.E.2d 572 (Mass. 2004) ...........30, 49, 53

*Bushkin Assocs., Inc. v. Raytheon Co.*, 906 F.2d 11 (1st Cir. 1990) ......................33

*Campbell Soup Co. v. Giles*, 47 F.3d 467 (1st Cir. 1995) ................................28, 40

*Capstone Logistics Holdings, Inc. v. Navarrete*, 838 F. App'x 588 (2d Cir. 2020) ................................56

*Charette v. Town of Oyster Bay*, 159 F.3d 749 (2d Cir. 1998)................................40

*Ciani v. MacGrath*, 114 N.E.3d 52 (Mass. 2019)................................33

*Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024) ................................30, 32, 35

*Clauson v. Smith*, 823 F.2d 660 (1st Cir. 1987) ................................52

*Comcast of Maine/New Hampshire, Inc. v. Mills*, 988 F.3d 607 (1st Cir. 2021) ................................28

*Consol. Gold Fields PLC v. Minorco, SA*, 871 F.2d 252 (2d Cir. 1989)................39

*Copeland LP v. Thurston*, 732 F. Supp. 3d 1003 (E.D. Mo. 2024)........................31

*CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50 (1st Cir. 2020) ................................*passim*

*Cynosure LLC v. Reveal Lasers LLC*, No. 22-cv-11176-PBS, 2022 WL 18033055 (D. Mass. Nov. 9, 2022) ................................35, 48

*Daikin Applied Americas Inc. v. Russo*, No. SJC-13881, 2026 WL 3068227 (Mass. Oct. 14, 2026) ....................49

*Davis v. City & Cnty. of San Francisco*, 890 F.2d 1438 (9th Cir. 1989) ................55

*DraftKings, Inc. v. Hermalyn*, 118 F.4th 416 (1st Cir. 2024)............................28, 30

*DraftKings, Inc. v. Hermalyn*, 732 F. Supp. 3d 84 (D. Mass. 2024), *aff'd* 118 F.4th 416 (1st Cir. 2024)....................*passim*

*EMC Corp. v. Breen*, SUCV201204477BLS2, 2013 WL 1907460 (Mass. Super. Feb. 25, 2013)....................41

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 487 F.Supp. 1248 (D. Md. 1980), *aff'd*, 650 F.2d 495 (4th Cir. 1981)....................40

*Frequency Therapeutics, Inc. v. Weber*, No. SUCV20180347-BLS2, 2018 WL 6933369 (Mass. Super. Nov. 28, 2018)....................50

*Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927 (1st Cir. 1988)....................42

*Infinity Broadcasting Corp. v. Greater Boston Radio, II*, Inc., No. CIV.A. 93-11161-WF, 1993 WL 343679 (D. Mass. Aug. 18, 1993), opinion adopted, No. C.A.93-11161-MLW, 1994 WL 697481 (D. Mass. Sept. 16, 1994) ....................41

*Jackson v. Fair*, 846 F.2d 811 (1st Cir. 1988)....................40

*King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153 (1948) .......35

*Kroger Specialty Pharmacy LA, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 24-5513, 2024 WL 5003233 (6th Cir. Dec. 6, 2024) ....................54

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004)...............56

*Lawless v. Steward Health Care System, LLC*, 894 F.3d 9 (1st Cir. 2018)............37

*LightForce Orthodontics, Inc. v. Align Tech., Inc.*, No. 25-MC-91583-AK, 2026 WL 1133400 (D. Mass. Apr. 27, 2026)....................43

*Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432 (D. Mass. 2010) ....................45, 48

*Marcam Corp. v. Orchard*, 885 F. Supp. 294 (D. Mass. 1995) ..............................44

*Nat'l Med. Care, Inc. v. Sharif*, No. CV 20-11460-MBB, 2020 WL 6318922 (D. Mass. Sept. 2, 2020) ......................................................................40, 41, 50

*NBA Props., Inc. v. Gold*, 895 F.2d 30 (1st Cir. 1990)..........................................55

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) ..................44

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331 (Fed. Cir. 2003) .........................56

*Ottaviano ex rel. Ottaviano v. Kings Park Cent. Sch. Dist.*, No. 10-CV-4962, 2010 WL 5437220 (E.D. N.Y. Dec. 23, 2010)............................................39, 40

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 Fed. Appx. 969 (6th Cir. 2007) ...........................................................................................................39

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998)..........................54

*Pineda v. Skinner Servs., Inc.*, 22 F.4th 47 (1st Cir. 2021) ...........……………28

*Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219 (1st Cir. 2003) .......................42

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) ......................................................................................................28, 33

*S.E.C. v. Lorin*, 76 F.3d 458 (2d Cir. 1996)............................................................56

*Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997).............................................................................................................52

*SimpliVity Corp. v. Bondranko*, 204 F. Supp. 3d 340 (D. Mass. 2016) ..................48

*Thermo Web Systems, Inc. v. Beebe*, No. 00-40170-NMG, 2000 WL 1876418 (D. Mass. Dec. 20, 2000)...................................................................41

*Tuckerbrook Alternative Invs. v. Banerjee*, Civ. A. No. 08-10636-PBS, 2008 WL 2356349 (D. Mass. June 4, 2008).............................................48

*U.S. ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248 (2d Cir. 2004).....................39

*U.S. v. One Star Class Sloop Sailboat*, 546 F.3d 26 (1st Cir. 2008) .................38, 40

*Weaver v. Henderson*, 984 F.2d 11 (1st Cir. 1993) ................................................42

## STATUTES

18 U.S.C. § 1836 .......... 21

Mass. Gen. Laws ch. 93, §§ 42, 42A-42G .......... 21

Mass. Gen. Laws ch. 149, § 24L .......... *passim*

Mass. Gen. Laws ch. 149, § 24L(a) .......... 31

Mass. Gen. Laws ch. 149, § 24L(b)(iii) .......... *passim*

Mass. Gen. Laws ch. 149, § 24L(b)(v) .......... 8

Mass. Gen. Laws ch. 149, § 24L(b)(vi) .......... 8

## RULES

Fed. R. Civ. P. 65 .......... *passim*

Fed. R. Civ. P. 65(c) .......... 24

Fed. R. Civ. P. 65(d) .......... *passim*

U.S. District Court Local Rule 7.1 .......... 25, 51

## OTHER AUTHORITIES

S. 840, 190th Gen. Ct. (Mass. 2017) .......... 34

## ISSUES PRESENTED

1. Whether the United States District Court for the District of Massachusetts (the "District Court") abused its discretion when it issued a preliminary injunction based on its findings that the noncompetition restrictions contained within a series of Employee Confidentiality, Assignment, and Protective Covenants Agreements (each, an "Agreement") entered into by Defendant-Appellant Micah Much ("Much") were not broader than necessary to protect Plaintiff-Appellee Fresenius USA Manufacturing, Inc.'s ("FUSA") legitimate business interests, and otherwise satisfied the Massachusetts Noncompetition Agreement Act. Mass. Gen. Laws ch. 149, § 24L (the "MNAA" or "Section 24L").

2. Whether the District Court abused its discretion by not conducting an evidentiary hearing when it was neither requested by the parties nor necessary based on the evidence.

3. Whether the injunctive relief issued requires clarification because it includes (a) reference to the Agreements or (b) an order to identify and return FUSA confidential information that Much acknowledges possessing.

## PRELIMINARY STATEMENT

The noncompetition covenants signed by Much do not prohibit him from working in his chosen field in supply chain and logistics; they merely seek to ensure that a senior-level executive with substantial knowledge of confidential information and strategies does not immediately take a similar role with a direct competitor. This case is the exact type of situation that warrants enforcement under the MNAA.

As the Vice President Supply Chain Americas for FUSA, Much was a trusted, highly compensated senior executive responsible for the supply chain infrastructure of the Care Enablement division of FUSA and its parent company, Fresenius Medical Care Holdings, Inc. and its affiliates (collectively, "FME"). Because of his responsibilities and their intersection with multiple aspects of FME's business (*e.g.*, manufacturing, the supply chain, and sales), Much necessarily had access to, knew, and utilized FME's most sensitive confidential information and trade secrets, including those concerning supply chain operations, logistics strategies, transportation strategies, future products and launches, manufacturing, sourcing initiatives, inventory, commercial plans, pricing, vendor relationships, operational vulnerabilities, cost-reduction efforts, long-range business objectives and other FME strategies in the Americas and globally. FUSA

only shared this information with Much because of contractual promises to maintain its confidential information and not compete for one year after resigning.

Vantive US Healthcare, LLC ("Vantive") is the primary competitor in a key segment of the kidney care industry. While employed, Much and other FME executives regularly analyzed Vantive and strategized on competing with it.

Vantive recruited Much for months while he continued to acquire and use FME's confidential information, including three-to-five-year strategic roadmaps for products and services. Much resigned from FUSA to become Executive Vice President and Chief Supply Chain Officer at Vantive, where he states he has "responsibility for supply chain functions worldwide," including "establishing overall strategy." (JA 446-447).[1]

On August 31, 2026, Chief Judge Casper issued a Memorandum and Order (the "Order") and granted FUSA's motion for a preliminary injunction. (Add. 2-19). In its comprehensive 18-page decision, the District Court preliminarily enjoined Much from unfairly competing against FUSA at Vantive and required Much to identify and return to FUSA its confidential information. On September

---

[1] Citations to the Joint Appendix are labeled "JA", with Volume I containing pages 1 to 347, and Volume II containing pages 348 to 651. Citations to the Supplemental Appendix are labeled "SA". This brief may also describe the document cited, such as a Declaration ("Dec.") or the Transcript from oral argument on August 25, 2026 ("Tr."). Citations to the Addendum are labeled "Add." Citations to Much's Opening Brief are labeled "Br." Page numbers follow the citations.

10, 2026, the District Court entered the Order of Preliminary Injunctive Relief (the "P.I."), setting out the obligations consistent with the Order. (Add. 20-21).

Much seeks to overturn the District Court's well-reasoned decision based on an inaccurate standard of review, a misinterpretation of the MNAA, a mischaracterization of the protectable interest, and a belated, unraised complaint about process that did not affect the ruling.

The District Court properly found that the Agreements complied with the MNAA because they were narrowly tailored to protect FUSA's interests, and that the evidence in the record, including Much's own admissions and testimony from his new employer, supported the preliminary injunction. The District Court did not abuse its discretion by ruling based on robust submissions by the parties, where Much never sought an evidentiary hearing and was otherwise content to submit the matter to the District Court on the papers. Finally, the preliminary injunction clearly informed Much of his expected conduct and otherwise meets the requirements of Rule 65 of the Federal Rules of Civil Procedure ("Rule 65").

The District Court's Order and P.I. should be affirmed.

# STATEMENT OF THE CASE

## I. Statement of Facts Relevant to the Appeal

### A. Care Enablement and Vantive Are Competitors

FME is a leading provider of products and services for people with chronic kidney failure. (JA 262). FME supplies dialysis products to patients, dialysis clinics and hospitals, supporting peritoneal dialysis ("PD"), home dialysis, and in-center hemodialysis, as well as devices used in extracorporeal membrane oxygenation. (JA 262).

"Care Enablement" refers to FME's global medical device technology business – it consolidates product research, manufacturing, supply chain and commercial operations to support dialysis treatments worldwide. (JA 322-323). It plans and distributes all products needed by its dialysis customers (*e.g.*, clinics, hospitals, and patients treating at home). (JA 322). These products include a comprehensive range of medical devices, related supplies and renal pharmaceuticals, including dialysis machines, reverse osmosis systems, dialyzers, dialysate, prescription drugs, dialysis bloodlines and necessary accessories such as surgical masks and gloves. (JA 322). Care Enablement manufactures many of these items and purchases others from third-party sources. (JA 322). To ensure the products are available and delivered to customers, Care Enablement operates and/or outsources operations to warehouses globally, including those in North and Latin America, and their storage and delivery must meet regulatory and

temperature control requirements. (JA 322-323). Storage and distribution are key factors in controlling costs, as the storage and distribution of products can be more costly than the product itself, particularly in the PD business for in-home patients. (JA 323).

Vantive is the primary, direct competitor of Care Enablement with respect to products and services for PD business and critical care dialysis. (JA 329-330, 353). Vantive similarly operates a supply channel through which it sources, stocks, stores and delivers its products to its patients and customers, and the companies directly compete in significant areas of strategic importance for the PD business and critical care dialysis. (JA 323, 329-330, 464-465). Vantive is specifically discussed as a key competitor during internal strategic meetings within FME. (JA 329, 353-355).

### B. Much Was a Highly Paid Executive at FUSA and Agreed to Post-Employment Restrictive Covenants in Exchange for Long-Term Incentive Awards

FUSA hired Much effective September 30, 2022, as Vice President North America Supply Chain and he became the Vice President Supply Chain Americas in January 2025. (JA 265-266). Much's employment within "the Care Enablement division [at FUSA]" was his first in the kidney care industry. (JA 266, 313-315, 417-418, 424). As Vice President Supply Chain Americas, Much was a senior executive earning over $645,000 in 2025. (JA 266). Much's substantial

compensation is reflective of the importance of his position and critical role. (JA 322-324).

Much was an executive leader responsible for the overall supply chain management of Care Enablement, managing its supply chain budget and overseeing the processing and delivery of products to more than 30,000 clinics, hospitals, and in-home patients. (JA 267-268). He was responsible for the strategic vision and operational excellence of Care Enablement's supply chain operations for all of North and South America. (JA 267-268, 316-319, 322-324).

In connection with his receipt of awards under FME's long-term incentive plan ("LTIP"), Much agreed to be bound by a series of Agreements dated November 28, 2022, August 1, 2023, July 25, 2024, and July 28, 2025, for which he received a payout and incentive grants.[2] (JA 31-91, 266-267). Through each Agreement, Much received substantial consideration to recognize and comply with promises not to disclose FME's confidential information, not to engage in prohibited solicitation for one year, and not to engage in certain competitive employment for one year. (JA 31-91).

---

[2] FUSA limits its discussion to the provisions of the Agreements relevant to this appeal. FUSA discusses the Agreements' compliance with the MNAA in full in its Motion with the District Court. (JA 100-121). For simplicity, FUSA cites to the 2025 LTIP Agreement, because the "provisions at issue in this case are substantially identical across the four agreements." (Br. 6). Each of the Agreements does not supersede prior restrictive covenants. (JA 84, 2025 LTIP Agreement § 10).

With respect to his noncompetition obligations, Much agreed that for twelve (12) months following termination of his employment, he would not "work for or in furtherance of any Competing Business[3] within the Restricted Area[4] in circumstances where [his] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities [he] performed for the Company[5] during the Look Back Period."[6] (JA 81). The Restricted Area is limited to the geographic areas in which Much provided services or had material presence or influence, and his noncompetition restrictions only apply to work for a competitor where his work will involve duties and services that are the same or substantially similar to any of his duties or services during the last two years of his employment. (JA 80-82). *See* Section 24L(b)(v) and (vi) (scope of each is presumptively reasonable).

### C. Much's Knowledge of and Access to Confidential Information and Trade Secrets

As Vice President Supply Chain Americas at FUSA, Much was privy to confidential information and trade secrets throughout the FME organization. (JA

---

[3] Although Much asserts that he cannot identify what could be a "Competing Business," (Br. 36), he admits Vantive is one. (JA 424).

[4] Much agreed that the Restricted Area may be defined for him to be the entire United States, and he does not challenge the geographic reach on appeal. (JA 80).

[5] "Company" is defined as FUSA "and its related/affiliated companies." (JA 75).

[6] "Look Back Period" is defined as "the two-year period preceding the termination of [Much's] employment with the Company . . . ." (JA 80).

324). As the architect of future supply chain and distribution model strategies for FME's Care Enablement division in the Americas, Much interacted heavily with corporate departments within FME, as well as outside suppliers and consultants, to determine long-term strategy for the organization and to make daily tactical decisions. (JA 322-323). Much's email address had the domain name "@freseniusmedicalcare.com" and he referred to himself as the "Vice President, Supply Chain Americas Care Enablement (CE), Fresenius Medical Care." (JA 364).

Because Much was responsible for ensuring that items are available, stocked and delivered in a timely manner, he knew products coming in the pipeline so his supply chain team could be ready to accommodate new items and anticipated increases/decreases in volume of Care Enablement's products and customer needs. (JA 323). Much's knowledge, input and collaboration with others shaped procurement and manufacturing decisions and strategy, as well as supply chain logistics. (JA 351-352).

FUSA submitted numerous examples of confidential information Much had knowledge of and access to through discussions and high-level, confidential projects, meetings and strategies, which, if known by a competitor, would provide the competitor with an unfair advantage by allowing it to reap the rewards of these strategies while avoiding the investment FME makes into these efforts. (JA 323-

330, 333-347, 352-357, 361-372, 375-382, 384-389; SA 2-27). The declarations described meetings at which many of these confidential strategies were discussed.

*1. Americas Supply Chain Strategy Leadership Offsite Meetings*

From June 8, 2026, through June 12, 2026, Much led a strategic-planning meeting called the Americas Supply Chain ("ASC") Strategy Leadership Offsite with the goal to identify and prioritize a three- to five-year plan for the organization. (JA 375-378). These meetings, in which Vantive was identified as a competitor, led to the development of a detailed Americas Supply Chain Strategy 2026-2031, which prioritized the projects and initiatives. (JA 375-378). The types of information shared at this meeting (and with Much generally) include: Americas Supply Chain 2026-2031 strategic objectives; a five-year Global Manufacturing and Supply Chain (MSC) plan entitled MSC 2030 that involves cost structure, performance, technology enablement, advanced analytics, inventory planning support and risk strategy and management; Program Management Office strategies through 2030; Latin America (LATAM) strategic initiatives from 2026 through 2029; and human resources strategies. (JA 329, 375-378, 380-382, 384-389; SA 21-27). The output of the offsite was the Americas Supply Chain Strategy 2026-2031, outlining a multi-phase, five-year Americas supply chain strategy. (JA 377-378, 384-389). Those strategies are confidential and describe the roadmap of the

ASC plans, which would be invaluable to Vantive because if Vantive knew them, it could adjust its strategies to gain a competitive advantage. (JA 378).

*2. PD Turnaround Project*

The PD Turnaround Project is a high-level initiative focused on the PD business for in-home patients, for which Vantive is a primary competitor. (JA 353). Because supply chain, manufacturing and commercial sales are all critical elements of the PD business, Much, the Senior Vice President Production Americas and the Senior Vice President, Head of U.S. Commercial Operations were key stakeholders in the PD Turnaround Project. (JA 350, 353-355). Through these quarterly meetings, and in the advance preparation for them, Much and other executives reviewed and discussed confidential information and strategies related to supply chain, manufacturing and commercial sales issues impacting the PD business, including, current and future products and strategies, product launch strategies, market analyses including growth analyses, financial analyses (profitability, costs, pricing, margins, etc.), vendor relationships, weaknesses and strengths within the business, and competitive analyses, including specifically strategies in relation to its competitor, Vantive. (JA 353-354).

On June 8, 2026, Much attended a PD Turnaround Project meeting and received a copy of a presentation labeled "Strictly confidential – for internal use only." (JA 354-355; SA 2-4). At this meeting, highly confidential information and

strategies related to the PD business were discussed, including profitability analyses, challenges faced, and trends in patient levels. (JA 354). The June 8 meeting included a review of FME's benchmarking, projections and goals for the PD business, and key financial analyses and strategies through 2028. (JA 354). Further, the meeting reviewed FME's confidential market growth and pricing strategies in the PD business, including specifically growth strategies in relation to Vantive. (JA 354). On June 10, 2026, Much received an email referencing key items from the June 8 meeting, including confidential strategies about competing with Vantive with respect to pricing, costs, market share and product analyses. (JA 355).

*3. Executive Manufacturing Supply Chain (MSC) Project Review*

Much participated in the Executive Manufacturing Supply Chain ("MSC") Project Review meetings at which FME's corporate strategies and projects were discussed and planned out. (JA 325-327). At the May 21, 2026, meeting, hosted by the CEO and Chairman of the Management Board of Fresenius Medical Care, Much spoke about two confidential projects he was leading, including strategies lasting through the end of 2026 and Q1 of 2027. (JA 325-326). Much also received confidential business strategies, such as customers' purchasing and related support plans, for high-volume hemodiafiltration, a dialysis treatment modality that is new to the United States and enabled by FME's 5008X CareSystem hemodialysis

device. (JA 326). Much knows about a non-public product offering, its manufacturing setup, the plan for the next three years to build up inventory and where and how Care Enablement intends to deploy it, as well as confidential manufacturing plans for certain prescription items and efforts and status with Food and Drug Administration for PD in the United States market. (JA 326-327).

*4. Executive Meetings for Sales, Inventory and Operations Planning*

Much was an integral participant in sales, inventory, and operations planning ("SIOP"). (JA 327-328, 333-336). Much described SIOP as a cross-functional business process that brings together personnel from commercial, finance, procurement, manufacturing and logistics to determine how the organization will satisfy product demand and to evaluate available production capacity, inventory levels, transportation costs and financial objectives. (JA 420-421). Critically, Much testified he "essentially served as a referee between the commercial, finance, and manufacturing teams, facilitating consensus regarding production, inventory, and deployment decisions." (JA 430).

Much was a key participant in the monthly executive SIOP meetings. (JA 327-328, 333-336). Much described the agenda of one recent SIOP executive meeting as entailing, "[e]xecutive focus on decisions needed and top risks reviewed" and stated the group covered "critical items." (JA 327-328, 333-336). During these meetings, and as a general responsibility of Much, he was privy to

information about upcoming product launches, pipelines, margins, costs and profitability, including for the PD business. (JA 327-328, 333-336). Because SIOP planning requires inventory, storage and distribution planning years in advance, Much had visibility into future product releases two to three years before launch and the business plans necessary to support them. (JA 375-378).

5. *Americas Supply Chain Operational Assessment*

Much also led a monthly Americas Supply Chain Operational Assessment Meeting. (JA 328). During the June 23, 2026 meeting, the group discussed the budgets and financial performance of the Americas supply chain, as well as the "Key Accomplishments," "Key Issues," "Key Deliverables" and "Strategic/Functional Plan Highlights." (JA 328, 338-347).

6. *Much's Meetings and Involvement in Strategies for Customers and Vendors*

Much worked directly with top customers. (JA 355). In late April 2026, Much participated in tours and meetings with leaders of FME's customer, DaVita Kidney Care ("DaVita"). (JA 355-356). During the meetings, Much and others discussed confidential issues concerning FME's relationship with the customer, FME's supply chain, operational performance reviews, economic valuations, and growth strategies/plans and products, among other topics. (JA 355-356). Much described the Americas Supply Chain as "a strategic asset . . . that's built for the complexity and criticality of hospital operations" in a presentation he marked

"STRICTLY CONFIDENTIAL – Not for Disclosure outside the company," which was shared with DaVita pursuant to contractual obligations not to disclose the information. (JA 355-356; SA 5-16). On July 15, 2026 – the day before Much provided his notice of resignation – Much was planning a summit with leaders of DaVita for August 2026. (JA 356-357; SA 17-20).

### D. Much Continues to Gather Strategies While Defecting from FUSA to Accept Employment at Vantive

Much began discussions with Vantive in early May 2026. (JA 442-443). Much attended several interviews with Vantive's leadership over the course of late May and June, and he received an offer from Vantive on June 15, 2026. (JA 442-443; SA 110-114). Much continued to attend high-level meetings and develop and gather FME's strategies while planning to leave FUSA for its direct competitor, including the Executive MSC Project Review, PD Turnaround Project, Executive SIOP monthly meetings, ASC Operational Assessment and ASC Strategy Leadership Offsite meetings, discussed above.

### E. Much Breaches His Agreements

On July 16, 2026, days after receiving a $70,000 retention bonus from FUSA, Much accepted Vantive's offer to become its Executive Vice President and Chief Supply Chain Officer. (JA 266, 443-444). Much provided notice of his

resignation and intent to join Vantive to lead its global supply chain on that same day (JA 330-331, 443-444, 553).[7]

Upon disclosing his intent to join Vantive, Much's access to FME systems was immediately shut off. (JA 270). Although he originally provided two weeks' notice, Much unilaterally and immediately accelerated his resignation date to July 24, 2026. (JA 270, 330-331).

Much commenced employment with Vantive on July 28, 2026. (JA 446). Much was hired as a senior executive, reporting directly to Vantive's CEO. (JA 446, 466). As Executive Vice President and Chief Supply Chain Officer at Vantive, Much was hired to "driv[e] continuity, strategy, and excellence across Vantive's fulfillment/logistics functions" and Much was "responsible for Vantive's global supply chain strategy, including procurement, manufacturing and logistics at the Center of Excellence level." (JA 466). Much admits he will "have some responsibility for the fulfillment and logistics function at Vantive." (JA 257). Much described his role at Vantive as having "enterprise-wide responsibility for supply chain strategy," and being "focused on establishing overall strategy, driving

---

[7] Much remarkably faults FUSA for continuing to share confidential information with him after he expressed frustration with his position. (Br. 20-22). But Much remained employed by FUSA, and Much continued to owe it a duty of loyalty at least until he disclosed his intent to join Vantive on July 16, 2026. (JA 552-553). The District Court properly rejected Much's contention that disappointment over a promotion made FUSA's continued trust unreasonable. (Add. 16).

consistency across regions, promoting best practices, and ensuring alignment among different functions within [Vantive].” (JA 446-447).

Further details are discussed below.

## II. Course of Proceedings

### A. The Motion

On August 5, 2026, FUSA filed suit against Much and moved for a temporary restraining order and preliminary injunction, seeking to enforce the noncompetition, non-solicitation, and confidential information preservation provisions in the Agreements. (JA 13-121). In support of its Motion for a Temporary Restraining Order and Preliminary Injunction (the “Motion”), FUSA filed supporting declarations of Heather Richins, Brett Beck, Brent Melancon, Almasa Lauredant, and Jeffrey S. Siegel, and exhibits thereto, some under seal, outlining the confidential information at issue, Much’s role at FUSA, Much’s resignation, Vantive as a competitive business, and other supporting facts. (JA 96-347, 350-389; SA 2-27).

The District Court issued a briefing schedule “[t]o give [Much] a full opportunity to respond to [FUSA’s] filings,” granting Much until August 17 to respond to the Motion, permitting a reply by FUSA by August 20, and scheduling

oral argument on August 25, 2026. (JA 6; ECF Nos. 19-21).[8] Much did not request an evidentiary hearing on the Motion. (ECF No. 20).

On August 17, 2026, Much filed his Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (the "Opposition"), along with declarations from Much, James R. Prutow (Executive Vice President and Chief Transformation Officer at Vantive), Daniel Roffman, and Julie McConnell and exhibits thereto, some under seal, including the 78-paragraph declaration from Much. (JA 390-539; SA 28-100).

On August 20, 2026, FUSA filed its Reply Memorandum In Further Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction (the "Reply"). (JA 540-551). In the Reply, and declarations of Joseph Turk, Jr. and Patricia Rich, FUSA emphasized that Much's employment violated Section 5(b) of the Agreements, that Much had knowledge of and access to confidential information and trade secrets, that the Opposition mischaracterized the evidence, and that the Agreements complied with the MNAA's signature and other requirements. (JA 540-557). Much did not seek leave to file a sur-reply or request

---

8 The scheduling motions were omitted from the Joint Appendix; citations therefore refer to ECF docket numbers. Much requested an August 12 response deadline but received until August 17. (JA 6, ECF No. 20).

that he be allowed to submit additional evidence at an evidentiary hearing or otherwise.

At oral argument on August 25, 2026, Chief Judge Casper provided both sides with an opportunity to present their arguments, and Much personally attended the hearing. (JA 602). During argument, FUSA's counsel described the evidence and argued that the standards of Rule 65 were met. (JA 603-622, Tr. 3-23). Counsel for Much had ample time to respond, and neither requested an evidentiary hearing, nor objected to proceeding on the papers. (JA 600-644).

### B. The District Court Grants FUSA's Motion

On August 31, 2026, Chief Judge Casper granted FUSA's Motion. In the 18-page Order, the District Court analyzed the facts (including declarations and exhibits), the parties' arguments, and applicable law.

The District Court first reviewed the factual background and materials, relying on matters that were uncontroverted. The District Court found that FME provides PD performed in a patient's home daily, and which necessitates a unique system of manufacturing, storage and delivery. (Add. 4). Care Enablement is the "organizational division" within FME that "centralizes its healthcare products business, including research and development, manufacturing, supply chain and commercial operations as well as supporting functions, such as regulatory and quality management" and is responsible for manufacturing and distributing

products used by FME customers. (Add. 4, citing Much Dec. ¶¶ 17, 20). The District Court determined that Vantive is Care Enablement's primary and direct competitor in the PD business for in-home patients (Add. 4; JA 636, Tr. 37).

The District Court found that before joining FUSA, Much had no experience in the kidney care or healthcare industry. (Add. 5). As the Vice President Supply Chain Americas for FUSA, Much was responsible for the "overall supply chain management of Care Enablement." (Add. 5). The District Court found that Much "interacted with the corporate departments of FME" regularly. (Add. 5). Among the types of confidential information Much had knowledge of and access to "by virtue of his role and through discussions, projects and meetings with other FME executives," the District Court highlighted: the Executive MSC Project Review meetings; the Executive SIOP meetings; and the PD Turnaround Project. (Add. 5-6). The District Court also found that Much engaged with FME customers and vendors, citing Much's participation in tours with DaVita. (Add. 6-7, citing Much Dec. ¶¶ 19-20).

After discussing the language of the Agreements and the consideration Much received for executing them (Add. 7), the District Court made findings concerning Much's resignation, including Vantive's recruitment in May 2026, Much's unilateral decision to exchange his FME-issued cell phone for a personal device on June 10, 2026, and Much's verbal job offer from Vantive on June 15,

2026. (Add. 7-8, citing Much Dec. ¶¶ 59, 61, 63, 67). After negotiating terms with Vantive and days following his receipt of a $70,000 retention bonus, Much resigned from FUSA effective July 24, 2026. (Add. 8, citing Much Dec. ¶¶ 63-64).

After concluding that the MNAA governed this dispute, the District Court turned to the likelihood of success on the merits of the breach of contract claims.[9] The District Court's legal analysis identified eight factors to have a valid and enforceable noncompetition agreement in Massachusetts, as set forth in *DraftKings, Inc. v. Hermalyn,* 732 F. Supp. 3d 84, 109 (D. Mass. 2024), *aff'd* 118 F.4th 416 (1st Cir. 2024), noting that only two of the factors were in dispute. (Add. 9).

As to the first challenged criterion, the District Court rejected Much's argument that the absence of the "name of [Much's] specific 'employer'" rendered the Agreements unenforceable. (Add. 9-10). The District Court found that "Employer" was defined in the Agreements and that the Agreements were entered into by the "Employer" and Much. (Add. 10). The District Court further found that the Agreements were signed by an authorized representative of the "Employer."

---

[9] In light of the District Court's conclusion on the breach of contract claims, it did not address the merits of the Motion regarding FUSA's claims under the Massachusetts Trade Secrets Act, Mass. Gen. Laws ch. 93, §§ 42, 42A-42G ("MTSA") and Federal Defend Trade Secrets Act, 18 U.S.C. § 1836. (Add. 15, n. 2). This Court may affirm the preliminary injunction on any grounds, including those set forth under these statutes. (JA 117-118, 549-550).

(Add. 10-11). The District Court distinguished *Anaplan Parent, LP v. Brennan*, No. 2584CV02350 (Mass. Super. Ct. Sept. 11, 2025), an unreported Massachusetts Superior Court case in which a parent company sought to enforce a noncompete in an equity agreement it (the parent company) was a party to while the employing entity was not. (Add. 11).

As to the second challenged criterion, the District Court found that the Agreements were "no broader than necessary to protect" specific "legitimate business interests of the employer." (Add. 11, quoting Section 24L(b)(iii)). The District Court found that the specific facts of the case demonstrated that the noncompetition restrictions were tailored in scope to Much's duties and responsibilities with FUSA, which was permissible under the MNAA. (Add. 12-13). The District Court found the Agreements satisfied the MNAA. (Add. 13-14).

The District Court then turned to FUSA's likelihood of success on the merits that Much breached the Agreements "by working at Vantive." (Add. 14-15). Relying on the language of the Agreements that bars Much from working for a Competing Business (as defined in the Agreements) where any of his duties and services overlap with those he had at FUSA, and Much's admissions that Much "will have some responsibilities for logistics functions at Vantive" and he will focus on "driving continuity, strategy and excellence across Vantive's supply chain functions including demand planning and logistics," the District Court found that

Much's work for Vantive "while more expansive, is substantially similar to at least some of the duties and responsibilities he had with [FUSA] in the past two years." (Add. 14, citing Much Dec. ¶ 18, Prutow Dec. ¶ 27). The District Court found that Vantive was a direct competitor "in areas that Much has knowledge of FME's confidential information and strategies." (Add. 15). Ultimately, the District Court concluded that it was "reasonably likely" that Much violated the Agreements through his employment at Vantive. (Add. 15).

The District Court analyzed the remaining pillars of Rule 65. The District Court noted that "[a] finding of irreparable harm is . . . triggered where the defendant has likely violated his noncompetition agreement" (citing *DraftKings*, 732 F. Supp. 3d at 120 (collecting cases)) and that Much stipulated in the Agreement as to irreparable harm. (Add. 15-16). The District Court found that "[i]n the months leading up to his resignation, Much led and attended several executive meetings discussing FME's plans for improving its supply chain in the Americas and at least one meeting discussing [FUSA's] strategies about competing with Vantive in the PD business." (Add. 16). Because Vantive hired Much "to drive continuity, strategy and excellence across Vantive's fulfillment/logistics functions," it "follows that Much will use his knowledge of FME's supply chain and strategies to the benefit of his former employer's direct competitor." (Add. 16).

The District Court rejected Much's contention—now abandoned on appeal—that FUSA delayed in seeking relief. (Add. 16-17).

As to the balance of equities, the District Court found that Much "voluntarily and knowingly entered into the Agreements and received the benefits conferred therein" and "retains the ability to work for companies that do not compete with [FUSA], including those in his prior industries." (Add. 17). Citing to Much's stipulation in the Agreement, the District Court found the balance of equities favored FUSA.[10] (Add. 17-18).

As to the final element of Rule 65, the District Court concluded the public interest favors enforcing contractual obligations between consenting parties. (Add. 18).

Because it determined that an injunction was warranted, the District Court ordered the parties to submit their positions about whether it should require a bond under Rule 65(c). (Add. 18). FUSA submitted its memorandum. (JA 578-582). On September 4, 2026, Much submitted his response memorandum on the bond issue, also asking for "clarification" of the Order. (JA 583-593). FUSA objected to Much's response, arguing that any challenge to the forthcoming P.I. should be

---

[10] Much submitted a redacted Vantive offer letter with his Opposition. (JA 457-462; Ex. C to Much Dec.). His bond submission included the unredacted letter and addressed his entitlement upon termination "because of the injunction." (JA 586; SA 109-114 (filed under seal)). Those negotiated protections further support the District Court's balance-of-harms finding.

addressed through motion practice pursuant to District Court Local Rule 7.1. (JA 594-599). Much never filed a motion with the District Court seeking such clarification or reconsideration.

On September 10, 2026, after ruling on the bond amount, the District Court issued the P.I., and Much subsequently filed his notice of appeal. (Add. 20-21; JA 11).

## SUMMARY OF THE ARGUMENT

The Court should affirm the District Court's Order granting FUSA's Motion and the resulting P.I. Much's noncompetition restrictions are enforceable under the MNAA. The Agreements' noncompetition restrictions are specifically tailored to the duties Much actually performed, and therefore, do not expand beyond protecting the confidential information, trade secrets and goodwill Much obtained through his employment with FUSA. The District Court specifically concluded that the Agreements were no broader than necessary to protect FUSA's legitimate business interests. Much's assertion that a noncompetition restriction is necessary "only" where alternative restrictive covenants would be inadequate is a clear departure from the text of the MNAA, improperly attempting to turn circumstances that may demonstrate a presumption of necessity into a statutory requirement. The District Court's conclusion is independently supported by Much's contractual acknowledgement, his executive-level, cross-functional role, and the practical risk

that he would use embedded strategic knowledge in his senior role at a primary competitor.

The District Court properly enjoined Much from serving as Vantive's Executive Vice President and Chief Supply Chain Officer because Much's duties for that competitor overlapped with responsibilities he performed for FUSA. Much had extensive knowledge of and access to FME's confidential supply chain, product, pricing, market, and competitive strategies, including strategies discussed concerning Vantive, and the Agreements prohibited him from performing any of the same or substantially similar duties for a competing business. His broader role at Vantive (a bigger role in a smaller company) did not eliminate that overlap; rather, the record, including Much's own admissions, supported the District Court's finding that FUSA was reasonably likely to demonstrate breach.

The District Court did not abuse its discretion by deciding the Motion on the extensive written record submitted by the parties and following oral argument. Much waived an evidentiary hearing by not requesting one, and now, having chosen to litigate on the papers and lost, for the first time challenges the process followed by the District Court. Even absent waiver, the parties had a fair opportunity to present evidence, and the District Court's findings concerning breach and irreparable harm rested on declarations, admissions, undisputed facts, and reasonable inferences. The claimed fact disputes are at the fringes and do not

cast doubt on the District Court's well-reasoned judgment that Much possessed FUSA's confidential information and trade secrets and his employment with a direct competitor posed a risk of irreparable harm.

Finally, Much did not present his Rule 65(d) objection to the District Court through proper means, and thus failed to preserve it for appeal. If the Court reaches the issue, the injunction satisfies Rule 65(d) by identifying the prohibited Vantive position, restricted period, and return and non-use obligations. Much did not properly seek clarification below, and any need for greater detail would, at most, warrant a limited remand for clarification rather than vacatur. Because the record supports requiring Much to identify and return FUSA's confidential information, those obligations are proper.

The Order and P.I. should be affirmed.

## STANDARDS OF REVIEW

Entitlement to injunctive relief pursuant to Rule 65 requires a showing that (1) the movant has a substantial likelihood of success on the merits; (2) there is a significant risk of irreparable harm if the injunction is withheld; (3) the balance of hardships favors the movant; and (4) there is a fit, or lack of friction, between the injunction and the public interest. *CVS Pharmacy, Inc. v. Lavin,* 951 F.3d 50, 55 (1st Cir. 2020). At that stage, the District Court need not conclusively determine

the merits of the underlying claims with absolute assurance. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).

A preliminary injunction is reviewed for abuse of discretion, with embedded legal conclusions reviewed *de novo* and factual findings reviewed only for clear error. *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 419 (1st Cir. 2024); *Pineda v. Skinner Servs., Inc.*, 22 F.4th 47, 52-53 (1st Cir. 2021). Under that deferential framework, this Court must uphold the District Court's factual findings—including findings drawn from documentary evidence and reasonable inferences—unless left with the definite and firm conviction that a mistake occurred. *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985). The abuse of discretion standard also governs the scope of the injunction. *DraftKings*, 118 F.4th at 423.

The District Court's "determination as to the need for an evidentiary hearing will be overturned only if a clear abuse of discretion is shown." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995) (quotation omitted).

This Court "can affirm the entry of the preliminary injunction on any ground supported by the record." *Comcast of Maine/New Hampshire, Inc. v. Mills*, 988 F.3d 607, 612 (1st Cir. 2021) (citation omitted).

## ARGUMENT

### I. The District Court Properly Concluded that the Agreements Comply with the MNAA

Much does not dispute that Massachusetts law permits reasonable noncompetition agreements under the MNAA and that FUSA has established seven of the eight factors for enforcement under the MNAA, as summarized in *DraftKings,* 732 F. Supp. 3d at 109. Much only challenges the District Court's finding with respect to Section 24L(b)(iii), which provides that to be enforceable, the noncompetition covenant:

> must be no broader than necessary to protect one or more of the following legitimate business interests of the employer: (A) the employer's trade secrets; (B) the employer's confidential information that otherwise would not qualify as a trade secret; or (C) the employer's goodwill. A noncompetition agreement may be presumed necessary where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant, including but not limited to a non-solicitation agreement or a non-disclosure or confidentiality agreement.

Section 24L(b)(iii). Much misconstrues the Order, the actual protectable interest at stake, and misapplies *Anaplan Parent*'s analysis.

#### A. The District Court Properly Found that the Noncompetition Restrictions Protect FUSA's Legitimate Business Interests

The noncompetition restrictions in Section 5(b) of the Agreements are specifically tailored in scope to Much's responsibilities with FUSA because they only seek to prohibit Much from competing "in circumstances where [his] duties,

services and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities [he] performed for the Company." (JA 81; Add. 12). Although the scope of restriction references "Company" (that is, FME), as the District Court noted, "it is nevertheless limited to the duties and responsibilities *Much actually performed*." (Add. 12) (emphasis added). *Boulanger v. Dunkin' Donuts, Inc.*, 815 N.E.2d 572, 577 (Mass. 2004) (restrictions are assessed "in light of the facts in each case"); *DraftKings, Inc.*, 732 F. Supp. 3d at 110.

The Order and resulting P.I. are consistent with Section 24L(b)(iii) because FUSA seeks to enforce these limited noncompetition restrictions to protect confidential information and relationships that Much obtained through his employment with FUSA. As the District Court correctly found, Much interacted with corporate divisions throughout Care Enablement and was privy to confidential information throughout the FME organization. (Add. 13). That information was not remote from FUSA's business. It included pricing, costs, market share, product analyses, and strategies for competing directly with Vantive—subjects bearing on FUSA's own operations and competitive position. (Add. 4-7). Information does not cease to implicate FUSA's legitimate business interests merely because it was developed jointly with, originated from, or was shared among affiliated entities. *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1344 (8th Cir. 2024) (affirming preliminary relief where a subsidiary president possessed protected information

touching all aspects of the affiliated enterprise's business); *Copeland LP v. Thurston*, 732 F. Supp. 3d 1003, 1012 (E.D. Mo. 2024) (protecting confidential information of affiliates); *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 129-131 (D. Mass. 2011) (same). Once information travels from a corporate affiliate to Much, it becomes FUSA's responsibility to protect because Much was a FUSA employee.

Much's Brief hyperbolically and incorrectly describes Section 5(b) of the Agreements as extending noncompetition protections to "more than 1,450 legal entities around the world." (Br. 31). That is not the case. The Agreements provide protection for *information* that Much obtained from his FUSA employment which originated within the FME entities and business lines. *See* Section 24L(a) (excepting from coverage of the MNAA nondisclosure or confidentiality agreements).[11] The Agreement is expressly limited to prohibiting competition only where Much's "duties, services and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities" he actually performed. Thus, the restrictions are tethered to Much's actual work and his actual employer FUSA.

---

[11] Unlike the Delaware cases Much cites, the Agreements restrict competition only as to duties Much actually performed for FUSA, not business segments in which he had no involvement. (Add. 12-13).

The Eighth Circuit's analysis of *Cigna Corp.* is instructive. 103 F.4th at 1342-1344. In *Cigna Corp.,* the Court affirmed a preliminary injunction enforcing a noncompete where the employee was a senior member of the leadership team, which "gave her access and insight into many other aspects of Cigna's business . . . ." *Id.* at 1342. Ms. Bricker was among executives who "across business units freely discussed key strategic information and decisions touching all aspects of Cigna's business." *Id.* at 1344 (quoting the record). The Court found that Ms. Bricker's agreement was not broader than necessary to protect her employer's interest. *Id.* at 1344. The same analysis applies here: Much's knowledge spans business lines, and his noncompete prohibits employment with a direct competitor based on his actual former duties and responsibilities.

### B. The District Court Found the Noncompete Necessary Without Having to Treat an Analysis of a Lesser Covenant as a Statutory Prerequisite

Much contends that the District Court failed to find that the noncompetition restriction was "necessary" and the "MNAA further narrows that necessity to instances 'where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant . . . .'" (Br. 38, quoting Section 24L(b)(iii)). Much misreads the Order and misstates the MNAA's requirements.

First, the District Court specifically analyzed and concluded that the Agreements meet the "third criteria" – *i.e.*, Section 24L(b)(iii) – concerning

necessity. (Add. 11). The District Court wrote, "[b]y restricting the noncompetition provision to Much's duties and responsibilities, the Agreements are not broader than necessary . . . ." (Add. 13). The District Court did not "clearly err[] in its factual assessments, or otherwise abuse[] its discretion in granting the interim relief." *Ross-Simons,* 102 F.3d at 15.

Next, the second sentence of Section 24L(b)(iii) creates a permissive presumption, not a statutorily mandated finding. It does not require, as Much argues, a separate, independent finding on the viability of lesser alternatives to protect FUSA's interests. (Br. 40). The second sentence of Section 24L(b)(iii) states, "A noncompetition agreement ***may be presumed necessary*** where the legitimate business interest cannot be adequately protected through an alternative restrictive covenant . . . ." (emphasis added). The phrase "may be presumed" supplies a route to a presumption; it does not require an employer to separately prove, as a prerequisite, that every lesser covenant will fail nor does it require a Court to specifically rule on the lesser alternatives. Much converts an available presumption into an exclusive test.

Much's argument, if adopted, would eliminate the phrase "may be presumed" from the analysis. *Ciani v. MacGrath*, 114 N.E.3d 52, 58 (Mass. 2019) (court must "strive to give effect to each word of a statute so that no part will be inoperative or superfluous."); *Bushkin Assocs., Inc. v. Raytheon Co.,* 906 F.2d 11,

14 (1st Cir. 1990). Moreover, the Massachusetts Legislature chose not to make this available presumption the exclusive means of demonstrating necessity, as Section 24L(b)(iii) does not provide that necessity may be found "**only**" where a lesser restriction would not suffice.[12]

The record independently supports the finding of necessity. Much expressly acknowledged in Section 5(b) of the Agreements that the noncompetition restriction was "necessary because the legitimate business interests of the Company cannot be adequately protected through an alternative restrictive covenant . . . ." (JA 81-82, *also,* JA 79). *DraftKings,* 732 F. Supp. 3d at 109 (contract language that restriction was necessary supports finding).

The contractual acknowledgement corroborates objective evidence and the "nexus between the [Agreements] and [FUSA's] legitimate interests in preserving its confidential information and trade secrets." *DraftKings*, 732 F. Supp 3d at 109. (disclosure of confidential information to competitor would place employer at a

---

[12] The legislative history supports FUSA's interpretation. In An Act Relative to Regulating Trade Secrets and Noncompetition Agreements, a precursor to the MNAA, Section (b)(5) stated, "A noncompetition agreement may be presumed necessary ***only*** where a legitimate business interest cannot be adequately protected through an alternative restrictive covenant including, but not limited to, a non-solicitation agreement, a non-disclosure agreement or a confidentiality agreement." S. 840, § (b)(5), 190th Gen. Ct. (Mass. 2017), available at https://malegislature.gov/Bills/190/S840 (emphasis added). In the MNAA, the term "only" was removed, further evidencing the Legislature's intention that the presumption was one, non-exclusive avenue for demonstrating necessity.

competitive disadvantage). Much occupied a senior, cross-functional role and regularly used confidential information and trade secrets while participating in high-level strategy discussions, including concerning Vantive, and meeting with customers. On that record, the District Court could reasonably conclude that lesser restrictions would not prevent Much from using his embedded strategic knowledge of FUSA while directing the worldwide supply chain for a direct competitor. (Add. 4-7). *CVS Pharmacy, Inc.*, 951 F.3d at 59 (observing that it "strains credulity to think that a top-echelon executive . . . could develop a strategy for [a competitor] without dipping into" knowledge of former employer's strategic initiatives and business relations). Given Much's senior and expansive role and knowledge, the noncompetition restriction was necessary. *DraftKings*, 732 F. Supp. 3d at 109. *See also, Cigna Corp.*, 103 F.4th at 1341, 1344 (executive overseeing supply chain routinely participated in executive meetings discussing key strategic information and decisions concerning all aspects of the employer's business); *Cynosure LLC v. Reveal Lasers LLC,* No. 22-cv-11176-PBS, 2022 WL 18033055, *11 (D. Mass. Nov. 9, 2022) (senior executive with detailed knowledge of business strategies).

### C. *Anaplan Parent* Does Not Require a Different Result

Much's reliance on *Anaplan Parent*, a non-binding, unreported trial court-level decision under review by the Supreme Judicial Court, is misplaced. *King v.*

*Order of United Commercial Travelers of Am.*, 333 U.S. 153, 159-62 (1948) (an unreported state trial court decision is not binding on federal courts).

*Anaplan Parent* did not hold that an employer cannot protect information related to its affiliates. In that case, the employee (Brennan) entered into noncompetition provisions contained within equity grant agreements by and between Brennan and Anaplan Parent, LP, the "parent" or "grandparent" company of Brennan's employer. No. 2584CV02350 at *1-2. The Court found that the noncompetition covenants contained within the equity grant agreements did not comply with the MNAA because the agreements were not signed by the actual employer of Brennan, but rather they were only signed by the parent company of the employer. *Id*. at *10-11. The *Anaplan Parent* court explained that to correct the agreement in that case, the contract "merely be amended to include the *actual* employer as a party and signatory thereto." *Id*. at *12 (emphasis in original). Here, the Agreements meet that standard – they were entered into between Much and FUSA, specifically stating, "Employer and I expressly agree . . ." and defining the term "Employer" as the "subsidiary of Fresenius Medical Care Holdings, Inc." that Much was employed by – *i.e.*, FUSA. (JA 75, 417 (Much Dec. ¶ 1), JA 556). Unlike *Anaplan Parent,* the Agreements are signed "On behalf of the Employer,"

and the corporate signatories thereto were authorized to sign, and did in fact sign, on behalf of FUSA. (JA 86, 556).[13]

Much would extend the reasoning in *Anaplan Parent* to mandate that only the employer's confidential information may be referenced in an agreement, relying on dicta in the decision. But that is not the law. Again, the issue in *Anaplan Parent* was whether a non-employer parent company may enforce a noncompetition covenant signed by only the parent company and not the employing entity. The issue presented in this case is whether an employer (like FUSA) may seek to enforce its own noncompetition covenant in an agreement it signed with its own senior executive, including to protect integrated operational and strategic information entrusted to him as part of his employment. The statutory text of the MNAA does not require the Court to treat integrated operational and strategic confidential information as unprotected simply because it may also reside within affiliated corporations – particularly where the restrictions are limited to the actual duties and responsibilities an employee recently performed. Thus, the

---

[13] As to the requirement of a signature of the employer, argued below but now abandoned on appeal by Much, there is nothing in the MNAA that requires the specific legal name of the employing entity to be identified in the agreement. To hold otherwise would add a new statutory obligation in the MNAA that the legislature declined to include. *Lawless v. Steward Health Care System, LLC,* 894 F.3d 9, 22-23 (1st Cir. 2018) ("Massachusetts courts generally will not add language to a statute where the Legislature itself has not done so . . . and we see no reason to depart from this salutary praxis here.") (cleaned up).

District Court properly concluded that the Agreements' noncompetition restrictions were not broader than necessary to protect FUSA's legitimate business interests.

## II. The District Court Did Not Commit a Clear Abuse of Discretion By Ruling Without An Evidentiary Hearing and Properly Found A Reasonable Likelihood of Success of Breach of the Agreements

The District Court properly concluded that FUSA satisfied the MNAA to enjoin Much from employment as Vantive's Executive Vice President and Chief Supply Chain Officer. (Add. 13-14). In its Memorandum of Law and Reply, FUSA explained why Much should not be permitted to work at Vantive. (JA 100-121, 540-551). On appeal, Much does not challenge the balance of hardships favors FUSA or the public interest was served by granting injunctive relief. (Add. 17-18). Instead, Much merely challenges the District Court's procedure and its findings of certain facts supporting the conclusion.

### A. Much Waived Any Claim to An Evidentiary Hearing

By now seeking an evidentiary hearing, Much argues that if he knew then what he knows now, he would have made a different strategic litigation decision. (Br. 42-48). That is both impermissible and outlandish.

It is well-established that if a party does not request an evidentiary hearing or otherwise indicates a willingness to rest on its papers, it waives any opportunity it may have to an evidentiary hearing. *See U.S. v. One Star Class Sloop Sailboat*, 546 F.3d 26, 33-34 (1st Cir. 2008) ("[W]hen the parties consent to proceed in a

particular manner (such as through written submissions), courts understandably are reluctant to give the loser a second bite at the apple on the ground that the agreed process was insufficient."); *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 Fed. Appx. 969, 975 (6th Cir. 2007) (plaintiff waived evidentiary hearing when it told the court it would not present witnesses); *U.S. ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 256 (2d Cir. 2004) (plaintiff "waived this argument by failing to request such a hearing until after the court had ruled against him."); *Consol. Gold Fields PLC v. Minorco, SA,* 871 F.2d 252, 256 (2d Cir. 1989) (same).

After the District Court granted Much more time to respond to the Motion than he requested (JA 6, ECF Nos. 20, 21), Much elected to file an Opposition and four declarations (including his own), and exhibits thereto, spanning hundreds of pages. (JA 6, 390-539; SA 28-100). In his written submissions, Much never asked for an evidentiary hearing. During the oral argument, Much's counsel did not request that the District Court conduct an evidentiary hearing or otherwise object to the District Court's intention to rule on the written submissions. (JA 600-644).

Given Much's choice to engage in a "battle of affidavits," he cannot now complain about the Court's factual findings and credibility determinations. *Ottaviano ex rel. Ottaviano v. Kings Park Cent. Sch. Dist.*, No. 10-CV-4962, 2010 WL 5437220, *5 (E.D. N.Y. Dec. 23, 2010). "Where, as here, a party waives their right to an evidentiary hearing, they are 'not entitled to have the court accept [their]

untested representations as true if they are disputed.'" *Id*. (quoting *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998)). "[O]nce a party joins 'the battle of the affidavits,' he has consented to a decision based on them and cannot complain about the result if he is the loser." *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 487 F.Supp. 1248, 1252–53 (D. Md. 1980), *aff'd*, 650 F.2d 495 (4th Cir. 1981).

Much's decision to file extensive briefing and failure to request an evidentiary hearing or otherwise object to Chief Judge Casper's process until filing this appeal should act as a waiver of his claim to such process. *Nat'l Med. Care, Inc. v. Sharif*, No. CV 20-11460-MBB, 2020 WL 6318922, *2 n. 4 (D. Mass. Sept. 2, 2020) (citing *One Star Class Sloop Sailboat,* 546 F.3d at 35).

### B. The District Court Did Not Commit a Clear Abuse of Discretion By Ruling on the Papers

Even absent waiver, the District Court did not abuse its discretion by deciding the Motion on the written record. An evidentiary hearing is not an indispensable requirement under Rule 65. *Campbell Soup Co.*, 47 F.3d at 470. The inquiry is whether the parties had a fair opportunity to present relevant facts and arguments and to answer the opposing submissions. *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir. 1988). Courts balance speed and practicality against accuracy and fairness when deciding whether affidavits and proffers suffice. *Jackson v. Fair*, 846 F.2d 811, 819 (1st Cir. 1988).

The proceedings here satisfy that standard. Much received an enlarged response period, submitted his own 78-paragraph declaration and three additional declarations with exhibits, and presented argument at the August 25 hearing. (JA 6, 390-539, 600-644; SA 28-100). The District Court then issued an 18-page decision identifying the evidence supporting its findings. (Add. 2-19). Moreover, the District Court was cognizant of its need to make its decision knowing that FUSA continued to be irreparably harmed by Much's insistence on continuing to work at Vantive even during the preliminary injunction proceedings. (JA 6; ECF No. 19).

It is not uncommon (or improper) for preliminary injunctions to be decided on the papers, without live testimony. *See e.g., CVS Pharmacy, Inc.*, 951 F.3d at 54; *Thermo Web Systems, Inc. v. Beebe*, No. 00-40170-NMG, 2000 WL 1876418 (D. Mass. Dec. 20, 2000) (issuing findings of fact and conclusions of law based on filings); *Nat'l Med. Care, Inc.*, 2020 WL 6318922 at *2; *Infinity Broadcasting Corp. v. Greater Boston Radio, II*, Inc., No. CIV.A. 93-11161-WF, 1993 WL 343679, *1 n. 1 (D. Mass. Aug. 18, 1993), opinion adopted, No. C.A.93-11161-MLW, 1994 WL 697481 (D. Mass. Sept. 16, 1994); *EMC Corp. v. Breen*, SUCV201204477BLS2, 2013 WL 1907460, *3-5 (Mass. Super. Feb. 25, 2013) (granting preliminary injunction on the papers, including competing affidavits).

The District Court's determination of this matter on the extensive written record should not be disturbed.[14]

### C. The District Court Made Reasonable Inferences from the Record Evidence

Even if Much were permitted to raise this argument on appeal, he has not identified any material factual dispute relevant to the Order that would warrant remand because "[i]t was the district court's duty—and its prerogative—to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." *Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 933 (1st Cir. 1988).

#### *1. The District Court Did Not Err in Finding a Likelihood of Breach*

The District Court's material findings on breach rested on Much's own declaration, Vantive executive Prutow's declaration, uncontroverted portions of FUSA's submissions, and reasonable inferences from the evidence presented. *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993). Those materials established Much's former responsibilities, his knowledge of and access to confidential

---

14 Much's cases are distinguishable. For instance, in *Rosario-Urdaz v. Rivera-Hernandez*, this Court vacated and remanded a "less than one page" denial of a preliminary injunction that was decided based solely on the complaint, answer, motions to dismiss, and memoranda, "but nothing of evidentiary quality." 350 F.3d 219, 221 (1st Cir. 2003). The Court favored a flexible approach, not a categorical hearing requirement. *Id.* at 223. Here, the District Court considered an extensive evidentiary record and issued a detailed, record-supported decision.

information and customers, Vantive's competitive position, and the overlap in supply-chain functions. Much knew FME's planned supply-chain initiatives, PD competitive strategies, and nonpublic manufacturing and deployment plans. *Aoude,* 862 F.2d at 894 (where critical factors not in dispute, no requirement to hold evidentiary hearing). The District Court's determination is fully supported by the record, and the law requires no more.

First, Much led the June 2026 Americas Supply Chain Strategy Leadership Offsite while his negotiation with Vantive was underway. The meetings identified Vantive as a competitor and produced the Americas Supply Chain Strategy 2026-2031, including long-term manufacturing, transportation, inventory, technology, and risk-management initiatives. (JA 375-378, 380-382; SA 21-27). *LightForce Orthodontics, Inc. v. Align Tech., Inc.,* No. 25-MC-91583-AK, 2026 WL 1133400, *4 (D. Mass. Apr. 27, 2026) ("Courts consistently hold that material related to a company's strategy, including competitive and market analyses, are trade secrets or confidential commercial information."). That roadmap bears on the work Much described at Vantive in establishing overall supply-chain strategy, promoting best practices, and coordinating functions across regions. (JA 446-447). Much's response that Vantive employs different strategies does not negate the potential value of knowing a competitor's plans when developing those strategies. (Br. 45). The District Court could reasonably infer that such knowledge would inform

competitive decisions. *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995).

Second, the PD Turnaround Project addressed the business in which Vantive directly competes with FME. Much attended and led cross-functional meetings concerning that project, including the June 8, 2026, meeting, and received a presentation labeled “Strictly confidential – for internal use only.” (JA 353-355; SA 2-4). The submissions identified pricing, costs, profitability, market growth, product plans, and strategies specifically concerning competition with Vantive. (JA 353-355). Much acknowledged attending cross-functional meetings and learning nonpublic information. (SA 73, JA 435). Much stops short of denying that he received information about new product development, instead stating that he does not recall receiving “detailed information,” but then despite his lack of memory, remarkably asserts that “if [he] did it would not be beyond what was publicly disclosed . . . .” (JA 435-436). *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999) (former employees may not feign ignorance of knowledge). Much did not rebut the broader evidence concerning competitive strategies, pricing, and market analyses that he clearly received due to his high-level role. (JA 435-436).

Third, the Executive MSC Project Review materials concerned more than publicly announced products. They included customers’ purchasing and support

plans for the 5008X CareSystem, as well as a nonpublic product offering, its manufacturing setup, a three-year inventory-building plan, and contemplated deployment. (JA 325-327; Add. 5). Public information about a product generally does not establish public knowledge of the operational plans for manufacturing, stocking, and deploying it. *Lombard Med. Techs., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439 (D. Mass. 2010) (confidential information exists in clinical trial strengths, weaknesses, and analyses where clinical trials are publicly available).[15] Nor does the public information establish a material dispute of fact, as Much does not negate any of FUSA's evidence that the project strategies were confidential and involved strategies and timelines expected to continue through the end of 2026 and Q1 2027. (Br. 47; JA 325-327, 426-427).

Beyond those examples cited in the Order, Much also ignores the following uncontroverted submissions: (i) JA 321-336 (Beck Dec., ¶¶ 6-31, Ex. A);[16] (ii) JA

---

[15] Public disclosure of the 5008X CareSystem in SEC filings did not disclose FME's deployment strategies or other nonpublic project details. Uncontroverted evidence showed Much knew customers' purchasing and related support plans. (JA 326, 436; SA 162). He also received information about a nonpublic product offering, its manufacturing setup, its three-year inventory-building plan, and its planned deployment. (Add. 5, citing Beck Dec. ¶ 20).

[16] With respect to Beck Dec., Ex. B, Much ignores that the group discussed confidential strategies, including the budgets and financial performance of the Americas supply chain, as well as the "Key Accomplishments," "Key Issues," "Key Deliverables" and "Strategic/Functional Plan Highlights." (JA 337-347) (Beck Dec., ¶ 25, Ex. B).

375-389 (Lauredant Dec. ¶¶ 5-14, Exs. A, C);[17] and (iii) JA 351-373; SA 2-4, 17-20 (Melancon Dec., ¶¶ 6-8, 18-24, Exs. A, C, D, E).[18]

Much's declaration reinforces the conclusion. Much was a self-described "referee between the commercial, finance, and manufacturing teams, facilitating consensus regarding production, inventory, and deployment decisions." (Add. 13, quoting Much Dec. ¶ 35). Much noted his involvement with the SIOP, "a cross-functional business process that brings together personnel from commercial, finance, procurement, manufacturing, and logistics to determine how the organization will satisfy its product demand." (Add. 6, quoting Much Dec. ¶ 11). The District Court specifically cited Much's description of a June 2026 SIOP meeting at which he addressed an "[e]xecutive focus on decisions needed and top risks reviewed." (Add. 6, citing Beck Dec. ¶ 23, Exs. A-B). Thus, Much's involvement was not confined to transporting products after others had made the

---

17 With respect to Lauredant Dec., Ex. B, Much ignores the larger issue that this presentation was from the ASC Strategy Leadership Offsite meetings he led in June to identify and prioritize a three- to five-year plan for the organization. (JA 375-383; SA 21-27) (Lauredant Dec., ¶¶ 7-14, Ex. B). This contained substantially more confidential strategic information than that which he even attempts to address, including far more than just the project he referenced. *Id.*

18 With respect to Melancon Dec., Ex. B (SA 5-16), Much points to just a single slide from the presentation, but even if the concept of outsourcing was public, that does not mean other information in the presentation was not confidential, as Much himself designated it.

relevant strategic decisions. It included the coordinated planning that his Vantive position would likewise require.

As to Much's engagement with FME customers and vendors (discussed at Add. 6-7), Much does not dispute FUSA's evidence concerning these meetings in any capacity. Much himself described the Americas Supply Chain as "a strategic asset . . . that's built for the complexity and criticality of hospital operations" on a presentation he marked "STRICTLY CONFIDENTIAL – Not for Disclosure outside the company," and which was only shared with customers pursuant to contractual obligations not to disclose the information. (JA 355-356; SA 5-16). It is a permissible inference that such information and customer relationships would be useful to a competitor.

Finally, Much claims that the District Court merely "surmised" that the confidential information and goodwill at issue could be valuable to Vantive without any evidence. (Br. 44). He is wrong, once again ignoring the actual evidence submitted by FUSA, including declarations where executives attested to the value these would have to a competitor. (JA 323-329, 352-355, 377-378). Vantive was specifically discussed and strategies modified based on it as a competitor. (JA 329, 353-355). The District Court could reasonably infer that Much's knowledge of those strategies would benefit Vantive in the senior executive role it hired him to perform.

*2. The District Court Did Not Err in Finding Irreparable Harm*

The District Court's conclusion that FUSA would be irreparably harmed if Much worked at Vantive was supported by the evidence before it. The District Court concluded that Much had access to and knew FME's confidential strategies, that Much continued working at FUSA knowing he was going to a competitor, and that Much would be taking a role at Vantive that had overlap with his responsibilities at FUSA. Those conclusions support a finding of irreparable harm.

First, in the Agreements, Much stipulated to the existence of irreparable harm. (JA 83). *Tuckerbrook Alternative Invs. v. Banerjee,* Civ. A. No. 08-10636-PBS, 2008 WL 2356349, *4 (D. Mass. June 4, 2008) (acknowledgment demonstrates irreparable harm). Furthermore, even in the absence of the contractual clause, Much's breach of the noncompete and joining of a competitor independently established irreparable harm. *Cynosure LLC*, 2022 WL 18033055 at *15; *Lombard Med. Techs., Inc.,* 729 F. Supp. 2d at 442 (even if a former employee promises to protect confidential information, irreparable harm exists because "it is impossible to imagine that [the employee] will not use, consciously or not, information gleaned" at former employer). It "strains credulity to think that a top-echelon executive like [Much] could develop a strategy for [Vantive] without dipping into" knowledge of FME's strategic initiatives and business relations. *CVS Pharmacy, Inc.*, 951 F.3d at 59; *see also SimpliVity Corp. v. Bondranko*, 204 F.

Supp. 3d 340, 350 (D. Mass. 2016) (summarizing the reasoning that supports irreparable harm in Massachusetts); *Boulanger,* 815 N.E.2d at 579 n. 12 ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove.").[19]

### D. The Record Evidence Supports the Order

The Agreements prohibit competitive employment when Much's new duties are "the same as or substantially similar to ***any*** of the duties and responsibilities" he previously performed. (JA 81) (emphasis added). The question is therefore whether Much's responsibilities overlap—not whether his positions are identical. Indeed, Much's declaration and Vantive executive Prutow's declaration alone supplied a sufficient factual basis for the District Court's finding of likely breach.

[19] The SJC's recent opinion in *Daikin Applied Americas Inc. v. Russo*, No. SJC-13881, 2026 WL 3068227 (Mass. Oct. 14, 2026) does not change the analysis. In *Daikin Applied,* the employer sought to enjoin former employees from contacting and soliciting customers pursuant to MTSA, notwithstanding a lack of noncompetition or non-solicitation agreement. *Id.* at *1, n. 4. The trial court denied a preliminary injunction that sought to create a judicially created non-solicitation obligation, and the SJC affirmed. The SJC declined to adopt a *per se* rule that irreparable harm exists whenever there is a misappropriation of trade secrets. Rather, the SJC found there was no abuse of discretion in declining to issue a preliminary injunction absent a showing of irreparable harm. *Id.* at *5. Unlike *Daikin Applied,* the District Court found that FUSA satisfied its obligation to show a likelihood that Much breached a contractual noncompetition restriction, and it made an independent finding of irreparable harm.

At FUSA, Much was responsible for the "overall supply chain management of Care Enablement." (Add. 5). He described his role as facilitating consensus among the commercial, finance, and manufacturing teams concerning "production, inventory, and deployment decisions." (JA 429-430). At Vantive, Much acknowledged that he would "have some responsibility for the fulfillment and logistics functions" and would exercise "enterprise-wide responsibility for supply chain strategy." (JA 257, 446-447). Prutow likewise described Much's responsibilities as driving "continuity, strategy, and excellence across Vantive's fulfillment/logistics functions" and directing its global supply chain strategy, including procurement, manufacturing, and logistics at the Center of Excellence level. (JA 466).

Those descriptions establish the relevant overlap. Much's contention that his Vantive position is broader than his former position does not eliminate the substantially similar functions within it. (Br. 22-23). The District Court considered that distinction, finding that Much's Vantive work, "while more expansive, is substantially similar to at least some of the duties and responsibilities he had for [FUSA] in the past two years." (Add. 14). *Nat'l Medical Care, Inc.*, 2020 WL 6318922 at *7 (finding breach where the new position included a broader range of duties but also substantially similar responsibilities); *Frequency Therapeutics, Inc. v. Weber,* No. SUCV20180347-BLS2, 2018 WL 6933369, *3 (Mass. Super. Nov.

28, 2018) (employee's high-level knowledge rendered a "carve[d] out" role that purported to avoid overlap with his prior employer's knowledge insufficient to protect former employer).

Significantly, the overlap is not merely incidental to an unrelated business. Vantive directly competes in the PD business in areas concerning which Much possessed confidential information and strategies. (Add. 4, 15). The District Court properly applied the contractual limitation to the responsibilities described by Much and his new employer. That evidence supported a likelihood of breach without requiring the Court to resolve a material credibility dispute.

## III. The Order and P.I. Satisfy Rule 65(d)

### A. Much Failed to Formally Raise His Concern to the District Court and Waived the Argument on Appeal

On appeal, Much belatedly argues that the injunction fails to comply with Rule 65(d). Much never presented his Rule 65(d) objection to the District Court. He has therefore waived any such arguments on appeal.

Much sought "clarification" through his September 4, 2026, submission in connection with bond briefing before the P.I. issued. FUSA responded that any challenge to the scope of the forthcoming order should be addressed through ordinary motion practice pursuant to District Court Local Rule 7.1. (SA 102–103; JA 598). Because Much did not pursue that procedure after entry of the injunction, and because he never raised such arguments in response to the Motion or FUSA's

requested relief, the Court should deem the present challenge unpreserved. *Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir. 1987).

### B. The Order and P.I. Are Not Vague and Much's Litigation Strategy Does Not Entitle Him to Vacate the Order

Even if this Court finds the issue properly preserved for appeal, the Order and P.I. satisfy Rule 65(d), and any correctable lack of detail would warrant clarification, at most, rather than vacatur of the injunction. While Rule 65 requires that an injunction order "state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required" that is not an onerous requirement. Fed. R. Civ. P. 65(d)(1)(A)-(B). An injunction, when "read as a whole [must provide] people of ordinary intelligence . . . a reasonable opportunity to know what is prohibited." *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 383 (1997) (citations and internal quotations omitted). "[E]laborate detail is unnecessary." *Axia NetMedia Corp. v. Massachusetts Tech. Park Corp.*, 889 F.3d 1, 13 (1st Cir. 2018) (internal quotations omitted).

Much argues that the ruling "bars a job title, not specific conduct" and claims uncertainty about whether he may perform procurement or manufacturing duties for Vantive. (Br. 50). The Order and P.I., however, address the permissibility of the only Vantive position placed before the District Court - Executive Vice President and Chief Supply Chain Officer. After finding that the position included some substantially similar duties and would permit Much to use

knowledge and strategies for a direct competitor, the Court ordered him to cease that employment through July 24, 2027. (Add. 14–21). That directive in the Order and P.I. provides notice that Much may not occupy the challenged role during the restricted period.

Much only sought to work at Vantive as its Executive Vice President and Chief Supply Chain Officer (Add. 8, citing Much Dec. ¶ 72). It was this role – and only this role – that Much contended was permissible under the Agreements and that was the subject of the Motion and underlying submissions. Noncompetition covenants are to be analyzed “in light of the facts in each case.” *Boulanger,* 815 N.E.2d at 577.

Much now seeks rulings on hypothetical, alternative duties at Vantive. He would ask that the District Court provide an analysis, at a granular level, as to what he can and cannot do in limitless, unidentified positions. The District Court was not required to evaluate an unlimited series of positions that were never presented for review. The District Court properly determined that because “it follows that Much will use his knowledge of FME’s supply chain and strategies to the benefit of his former employer’s direct competitor,” he should not be permitted to work at FUSA’s competitor, Vantive, during the pendency of the lawsuit. (Add. 16, citing *CVS Pharmacy, Inc.*, 951 F.3d at 59).

Much (and Vantive) could have created an alternative position with more restricted (and non-overlapping duties or geographies), but Much (and Vantive) chose not to. He apparently was inspired to "swing for the fences" and steadfastly contended he would be employed as Executive Vice President and Chief Supply Chain Officer at Vantive. In fact, Much (and Vantive) did so while specifically preparing for the likelihood that a court would bar him from working in this role. (JA 586; SA 113). Chief Judge Casper concluded the Executive Vice President and Chief Supply Chain Officer role violated the Agreements. "Having pursued the advantages of an all-or-nothing strategy in arguing against the injunction, [Much] may not belatedly obtain the benefits of the more moderate approach that, in the light of [his] defeat, now looks more attractive." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st Cir. 1998).

Much cannot credibly contend that the Order and P.I. leave him unable to reasonably discern which duties would violate its terms. Much knows better than anyone the specific tasks he performed for FUSA, and thus knows which tasks, when performed for Vantive or any other competitor, would violate the P.I. *Axia NetMedia Corp.*, 889 F.3d at 13 (affirming preliminary injunction where enjoined party was in best position to determine compliance); *Kroger Specialty Pharmacy LA, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 24-5513, 2024 WL 5003233, *4 (6th Cir. Dec. 6, 2024) (affirming injunction prohibiting employee from working in

"therapeutic areas he represented while employed by [employer]" because of the employee's "understanding of his own work" with employer).

### C. The Order and P.I. Set Out Much's Regulated Conduct

The Order and P.I. properly bar Much from violating the Agreements, and Much's concerns about "triggering contempt" are a red herring. Where parties have asserted that an injunction order gives them concern that a good-faith effort to comply with an order will render them vulnerable to contempt proceedings, "our case law accounts for such concerns by cautioning courts against finding contempt when faced with genuine ambiguities about an order's scope." *Axia NetMedia Corp.*, 889 F.3d at 13. Injunction orders "must simply be framed so that those enjoined will know what conduct the court has prohibited." *Id.* The injunction here does exactly that.

The Court should view the Order and P.I. in light of Rule 65's aim "to prevent uncertainty and confusion and to avoid basing a contempt citation on a decree too vague to be understood" and permit its enforcement. *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (cleaned up). Federal Courts of Appeal have cautioned to "not take[] a rigid approach to Rule 65(d)." *Davis v. City & Cnty. of San Francisco*, 890 F.2d 1438, 1450 (9th Cir. 1989) (upholding injunction that incorporated internal general order). The P.I. specifically identifies the competing employer, the executive position Much had that he cannot hold, the governing time

period, and his return and non-use obligations. It provides a direct and administratively easy-to-understand command. Much knew and understood the Agreements when he signed them, and in finding the Agreements enforceable and that Much breached the Agreements, the P.I. instructing Much to comply with the Agreements provides him the clarity he needs to avoid contempt.

Even if the Court determines a portion of the P.I. should describe prohibited conduct more precisely, the remedy is limited to clarification, not vacatur of the District Court's supported findings or dissolution of relief protecting FUSA from irreparable harm. The Court may affirm the injunction's merits while remanding solely for the District Court to refine the operative language. *Capstone Logistics Holdings, Inc. v. Navarrete*, 838 F. App'x 588, 591 (2d Cir. 2020) (affirming injunction and remanding to correct form); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 60-61 (2d Cir. 2004) (affirming injunction, and remanding for clarification); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1346-47 (Fed. Cir. 2003) (inaccuracy in injunction is harmless error under Rule 65(d)); *S.E.C. v. Lorin,* 76 F.3d 458, 462 (2d Cir. 1996) (affirming permanent injunction, and remanding for entry of order in conformity with Rule 65(d)).

### D. The Requirement to Identify and Return Confidential Information and Trade Secrets Is Supported by the Record

The P.I. requires Much to "identify and return all copies of Confidential Information and Trade Secrets as defined in the Agreements." (Add. 21). That

relief rests, at least in part, on Much's admission that he retained "a few Fresenius files in [his] Microsoft One Drive and Google Drive accounts." (JA 445). Much further testified that a third-party forensic consulting firm, Charles River Associates ("CRA"), he hired "collect[ed] data" from his devices and identified "information that could potentially relate to [FME] information." (JA 445). The District Court also considered that Much exchanged his FUSA-issued cell phone for a personal cell phone during the Vantive interview process. (Add. 7-8, citing Much Dec. ¶ 67; JA 268-269). Indeed, Much emphasizes that "Vantive required that Much promise to comply with his obligations in [the Agreements], including returning company property, protecting FME confidential information" and a promise not to disclose it to Vantive. (Br. 24; JA 446; SA 112-113). Those record facts supplied a concrete basis to require identification, return, and non-use of information, and the Order and P.I. did not depend on speculation that Much retained unidentified materials.

Much contends that because he hired CRA in connection with self-directed remediation efforts, he was not in possession of any of FUSA's information. (Br. 52, n. 8). This argument misses the mark. CRA is Much's vendor, and Much's voluntary efforts do not have the force of law.[20] Absent an order from the District

---

[20] Much disingenuously suggests that he hired CRA because FUSA "failed to respond to his inquiries" about the information that Much retained. (Br. 52, n. 8). The timeline reflects that by Monday, July 27, 2026 – days after Much's last day of

Court, there was nothing to stop Much from gaining access to the files that were, at one point after Much's resignation, on Much's devices and personal repositories. There also was no obligation prohibiting Much from disclosing strategies, future product details and other confidential information of FUSA. The District Court's ruling addressed that concern appropriately and need not be disturbed.

## **CONCLUSION**

The District Court's Order and the P.I. should be affirmed.

---

employment on July 24, 2026 – counsel for FUSA had contacted both Much and Vantive. (JA 122).

Respectfully submitted,

*Plaintiff-Appellee*

FRESENIUS USA MANUFACTURING, INC.

By its attorneys,

*/s/ Jeffrey S. Siegel*
Jeffrey S. Siegel (First Cir. No. 87845)
Sean P. O'Connor (First Cir. No. 1137121)
Robert Papandrea (First Cir. No. 1216847)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: November 2, 2026

## **Certificate of Compliance**

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this response complies with the type-volume limitation of Fed. R. App. P. 32(a).

1. Exclusive of the exempted portions of the foregoing, as provided in Fed. R. App. P. 32(f), the brief contains 12,936 words.

2. The foregoing has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

## **Certificate of Service**

I hereby certify that on November 2, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Jeffrey S. Siegel*
Jeffrey S. Siegel